Philadelphia Electric Company, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission and Joyce A. English,, Respondents.

Argued April 8, 1981, before President Judge CRUMLISH, JR. and Judges MACPHAIL and BLATT, sitting as a panel of three. Reargued June 8, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR., CRAIG, MACPHAIL and DOYLE.

*Leonard J. Cook,* with him *John F. Smith, III, Dilworth, Paxson, Kalish & Levy,* for petitioner.

*Benjamin G. Lipman,* Assistant General Counsel, with him *Robert S. Mirin,* General Counsel, for respondents.

*Alan K. Cotler, Pepper, Hamilton & Scheetz,* for Amicus Curiae, American Civil Liberties Foundation of Pennsylvania.

OPINION BY JUDGE MACPHAIL, August 9, 1982:

On April 26, 1977, Joyce English applied for the position of Customer Service Representative with the Philadelphia Electric Company (PECO). After she passed successfully all pre-employment tests and otherwise demonstrated her fitness for the job she was seeking, she was referred to PECO's medical department for a physical examination. The medical department uses a weight chart to screen prospective employees. The chart sets forth desirable weights for males and females of a given height and age. The weight standards are liberally administered with a 40 pound tolerance permitted on either side of the desirable weight standard, and, if a person's physical frame is such that an even heavier weight can be accommodated, the standards are not rigidly enforced against such persons.

On the date in question, Ms. English was 27 years old, 5′ 8″ tall and weighed 341 pounds.[1] According to PECO's weight chart, the desirable weight for Ms. English was 140 pounds. The medical department

---

[1] Ms. English is also black, a fact mentioned several times in the adjudication of the Pennsylvania Human Relations Commission but such fact is totally irrelevant to a disposition of the instant case since there is not even a hint of racial bias on the part of PECO.

classified Ms. English as unsuitable for work at PECO because of her abnormal weight. PECO, thereupon, rejected her application for employment.

Ms. English then filed a complaint with the Pennsylvania Human Relations Commission (HRC) alleging that PECO had refused to hire her "because of her handicap/disability, obesity which does not substantially interfere with her ability to perform the essential functions of the job." PECO responded to the complaint stating that Ms. English was refused employment because she failed to meet (PECO's) medical standards required of all applicants for employment, and denies that obesity is a handicap/disability under the Pennsylvania Human Relations Act (Act).[2]

After an extensive hearing, the HRC found in favor of Ms. English and ordered PECO to 1) cease and desist from discriminating against any handicapped or disabled applicant for employment unless such handicap or disability would substantially interfere with the applicant's ability to perform the job he or she is seeking 2) pay to Ms. English all sums to which she would have been entitled had she been hired on April 26, 1977 together with interest and 3) offer her the next available Customer Services Representative position or another position comparable thereto in terms of salary, promotional opportunities and duties.

PECO appealed from that order to this Court. The case was argued initially before a panel of this Court and then was directed for reargument. Counsel submit that this is a case of first impression in Pennsylvania. We agree.

STATUTORY BACKGROUND

Pennsylvania has had an anti-discrimination statute for upwards of 25 years. Until 1974, Section 5(a) of

--------

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§951-963.

the Act, 43 P.S. §955(a) prohibited discriminatory practices by employers because of race, color, religious creed, ancestry, age, or national origin. In 1974, "non-job related handicap or disability" was added as a prohibited basis for the denial of employment. The legislative history regarding the amendment is sparse, indeed, but the House Legislative Journal,[3] March 5, 1974, p. 3758 *et seq.* indicates that the need for such legislation was dramatized when some legislators undertook to perform their legislative duties while in wheelchairs. The only recorded comments of the legislators with respect to the pending bill were references to the blind, deaf, wheelchair patients and epileptics.

The 1974 amendment to the Act does not define handicap or disability but it does define "non-job related handicap or disability" as "any handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in or has been engaged in. Uninsurability or increased cost of insurance under a group or employee insurance plan does not render a handicap or disability job related." Section 4(p) of the Act, 43 P.S. §954(p). Since the definition uses the terms it purports to define, it is of little help in a resolution of one of the critical issues in this case, to wit, is obesity or morbid obesity a handicap or disability?

Shortly after Ms. English filed her complaint, HRC undertook to define a "handicapped or disabled person" by the promulgation of regulations which were

---

[3] There is no recorded discussion of the legislation in the Senate.

not finally adopted until 1978. The pertinent regulation is found at 16 Pa. Code §44.4.[4]

[4] *Handicapped or disabled person* — Includes the following:
(i) A person who:
(A) has a physical or mental impairment which substantially limits one or more major life activities;
(B) has a record of such an impairment; or
(C) is regarded as having such an impairment.
(ii) As used in subparagraph (i) of this paragraph, the phrase:
(A) "physical or mental impairment" means a physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems; neurological; musculoskeletal; special sense organs; respiratory, including speech organs, cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin, and endocrine or a mental or psychological disorder, such as mental illness, and specific learning disabilities.
(B) "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
(C) "has a record of such an impairment" means has a history of or has been misclassified as having a mental or physical impairment that substantially limits one or more major life activities.
(D) "is regarded as having an impairment" means has a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer or owner, operator, or provider of a public accommodation as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or has none of the impairments defined in subparagraph (i)(A) of this paragraph but is treated by an employer or owner, operator, or provider of a public accommodation as having such an impairment.
*Non-job-related handicap or disability* — Includes the following:
(i) Any handicap or disability which does not substantially interfere with the ability to perform the essential

PERTINENT FINDINGS AND CONCLUSIONS OF HRC

From the evidence received at the hearing[5] the HRC made the following critical findings of fact, all of which are supported by substantial evidence in the record:

## Findings of Fact

10. Joyce English was denied a CSC position by PECO for the sole reason that she failed the medical exam due to her obesity. (Exh. C-4: pp. 14-15, N.T. 167, 187, 194, 2.7)

11. PECO's medical department failed Joyce English in her medical examination because of their belief that massive obesity to the extent present in Ms. English, created a

---

functions of the employment which a handicapped person applies for, is engaged in, or has been engaged in. Uninsurability or increased cost of insurance under a group or employe insurance plan does not render a handicap or disability job-related.

(ii) A handicap or disability is not job-related merely because the job may pose a threat of harm to the employe or applicant with the handicap or disability unless the threat is one of demonstrable and serious harm.

(iii) A handicap or disability may be job-related if placing the handicapped or disabled employe or applicant in the job would pose a demonstrable threat of harm to the health and safety of others.

[5] Ms. English did not appear at the hearing because she now resides in Florida but her deposition was made a part of the record. That deposition indicates that Ms. English was a college graduate and had been employed prior to April 26, 1977 in the Job Corps, as a library assistant, in Vista, as a probation officer, at a canning factory, as a tutor-baby-sitter and as a cashier in a book store. She stated that work has never bothered her and that she was perfectly able to do a regular day's work at all times. She also stated that she had given birth to a child on March 28, 1978.

high risk that other medical problems would develop which might result in excessive absenteeism and underproductivity. (N.T. 76, 189, 211-212, 2.11)

12. Nothing about Joyce English's health or physical condition on April 26, 1977 suggested that she was medically less well suited than the average person to perform the duties of a CSC. (N.T. 89, 2.15-2.16, 2.25)

13. Nothing about Joyce English's health or physical condition on April 26, 1977 suggested with any reasonable degree of medical certainty that she was likely within the foreseeable future to develop illnesses or diseases which would render her less available for work or less productive. (N.T. 89, 199, 214)

14. On April 26, 1977, PECO considered Joyce English to be qualified for the CSC position and did not believe that her obesity would substantially interfere with her ability to perform the essential functions of the job. (N.T. 76)

. . . .

19. Joyce English was given a thorough medical examination on September 8, 1977 by Anna Marie Chirico, M.D. Her blood pressure was found to be 128 over 68 in the upper right arm and 120 over 80 in the forearm. There was no evidence of hypertension, diabetes mellitus, or any pulmonary, cardiovascular, or other respiratory or circulatory diseases or problems. (N.T. 80-87)

20. Compared to a person of average weight, a massively obese person has an increased likelihood of developing illnesses and diseases such as coronary heart disease, hypertension, respiratory failure and diabetes mellitus. (N.T. 196, 2.15, 2.44-2.56, 2.59, 2.74)

. . . .

24. Jobs in the Customer Service Department require a degree of mobility which a severely obese person might not have. (N.T. 215)

. . . .

27. Obese persons are less agile and more accident prone than non-obese persons. (N.T. 2.15, 2.53)

28. Obesity is commonly defined as the state of weighing 20 per cent or more in excess of one's desirable weight, as determined by Metropolitan Life Insurance Company tables. (N.T. 2.39, 2.40)

29. Morbid obesity is defined as weighing twice one's desirable weight or more; Complainant in this case was morbidly obese. (N.T. 2.44, 2.45)

. . . .

33. Obesity is positively correlated with the rate of absenteeism due to illness. (N.T. 2.58)

34. Severe obesity can pose a mechanical handicap by interfering with the physical ability to accomplish tasks. (N.T. 2.65-2.73)

Conclusions of Law

5. Morbid obesity is a handicap or disability within the meaning of Sections 4 and 5 of the Act. (43 P.S. 954, 955)[6]

6. Complainant's handicap or disability did not substantially interfere with her ability

---

[6] In its opinion, which accompanied the findings of fact and conclusions of law, the HRC noted that it was expressing "no opinion" as to whether persons who are obese, but not morbidly obese, are also handicapped or disabled.

to perform the duties of Customer Service Clerk.

7. Respondent has unlawfully discriminated against Complainant by refusing to hire her on the basis of her non-job related handicap or disability.

The fair inference from the conclusions of law appearing above is that the HRC has also concluded that on April 26, 1977, Ms. English was a handicapped person.

### BURDEN OF PROOF AND SCOPE OF REVIEW

The burden of proof in a case of this nature is on the complainant and counsel for the HRC. *Philadelphia v. Human Relations Commission*, 4 Pa. Commonwealth Ct. 506, 287 A.2d 703 (1972). An issue to be resolved in this case is the nature of that burden of proof. We think there is a two-part answer to that question: 1) she must prove that *at the time she applied for employment*, she was a handicapped person within the meaning of the Act *and* 2) she must prove that PECO refused to hire her *because* she was a handicapped person. HRC, obviously, determined that Ms. English sustained her burden of proof as to both elements.

The HRC order must be affirmed if it is in accordance with the law and if there is substantial evidence to support it. *Slippery Rock State College v. Pennsylvania Human Relations Commission*, 11 Pa. Commonwealth Ct. 501, 314 A.2d 344 (1974).[7]

### ISSUES

1. Did HRC err as a matter of law when it concluded that morbid obesity is a handicap within the meaning of the Act?

---

[7] No constitutional or procedural issue has been raised. *See* 2 Pa. C. S. §704.

2. Did HRC err as a matter of law when it concluded that Ms. English was a handicapped person within the meaning of the Act when she applied for employment with PECO on April 26, 1977?

3. Did HRC err as a matter of Law when it concluded that PECO's refusal to hire Ms. English was a discriminatory action within the meaning of the Act?[8]

### Morbid Obesity as a Handicap Within the Meaning of the Act

There is no question that on April 26, 1977 Ms. English was morbidly obese. All of the expert testimony indicated that Ms. English's weight was well beyond the "twice the desirable weight" medical definition of morbid obesity.

Inasmuch as the Act has failed to define handicap or disability as those terms are used in Sections 2, 4 and 5 of the Act, 43 P.S. §§952, 954 and 955, we must employ the provisions of the Statutory Construction Act of 1972, 1 Pa. C. S. §§1501-1991 to determine the intent of the legislature. By the terms of 1 Pa. C. S. §1903(a), we are instructed that words and phrases are to be construed according to their common and approved usage.

For the purposes of this case, we adopt the following definitions given the words here at issue as set forth in Webster's Third New International Dictionary 1027 and 642 (1966):

handicap: ... a disadvantage that makes achievement unusually difficult; esp: a physical disability....

disability: ... a physical or mental illness, injury or condition that incapacitates in any way....

---

[8] We are well satisfied that if the HRC order is upheld by this Court, Ms. English is entitled to the relief given to her by HRC notwithstanding her relocation to the State of Florida.

We also cite with approval a regulatory definition used by the HRC in reaching its determination. That definition defines a handicapped or disabled person as a person who "has a physical or mental impairment which substantially limits one or more major life activities." 16 Pa. Code §44.4. Although this regulation was adopted *after* the proceedings in this case were initiated, we believe it is helpful insofar as it reflects the common and approved usage of the terms at issue. We have avoided using alternative definitions which define "handicap" and "disability" in terms of their effect on work performance since in order for discrimination to exist in this case, a handicap must exist which is non-job related.

In applying the above regulation definition to the present case, the HRC pointed to medical testimony in this case to the effect that morbidly obese persons are susceptible to *potentially* disabling medical problems, that such persons are *regularly* associated with psychological disturbances and that morbidly obese persons *regularly* "work at breathing". From that testimony, HRC concludes that since working and breathing are major life activities which *may* be restricted in morbidly obese persons, *all* morbidly obese people are handicapped or disabled. HRC contends, therefore, that all that is necessary for Ms. English to prove in the instant case is that she is part of a class that is "generically categorized" as handicapped.

We have searched the record in vain for *any* testimony that would support the conclusion by HRC that *all* morbidly obese persons are handicapped. It is certainly true that both HRC and PECO have produced medical testimony that morbidly obese persons are *potentially susceptible* to several diseases and even premature death, but the HRC medical testimony offered through Dr. Brownell was only that obesity is a

disability in *some* people and the most that PECO's medical witness, Dr. Van Itallie, would say is that in morbidly obese persons, disability is "more likely" to occur than in other persons.

We, therefore, reject HRC's argument that if one is morbidly obese, he/she is by virtue of that fact alone, handicapped or disabled within the meaning of the Act. This does not mean, of course, that a morbidly obese person may not be disabled or handicapped, in fact, within the meaning of the Act. Our own conclusion is, therefore, that morbid obesity may be a handicap or disability within the meaning of the Act, but the condition of morbid obesity, alone, is not such a handicap or disability.

### WAS JOYCE ENGLISH A HANDICAPPED PERSON ON APRIL 26, 1977?

Since we have concluded that Ms. English is not a handicapped or disabled person within the meaning of the Act solely by virtue of the fact that she is morbidly obese, the next issue to be resolved is whether Ms. English was handicapped or disabled on the day she applied for and was denied employment. In *Burgess v. Joseph Schlitz Brewing Co.*, 298 N.C. 520, 259 S.E. 2d 248 (1979), an applicant for employment suffered from glaucoma which was correctable with glasses to 20/20 vision in both eyes. The applicant was denied employment and brought suit against the prospective employer on the grounds that he had been denied employment as a handicapped person. The Supreme Court of North Carolina construed the statute there under consideration, which was not unlike the Act we are called upon to construe here, as protecting those persons who are presently handicapped and not those who suffer from potentially disabling conditions, notwithstanding the requirement that the North Carolina statute was to receive a liberal construction with respect to its remedial provisions.

The Act here under consideration provides in Section 2 that the practice or policy of discrimination against individuals "because of their handicap or disability" is a concern to the Commonwealth. In Section 4(p), the Act provides that the term "non-job related handicap or disability" means a handicap or disability which *does* not interfere with the applicant's ability to perform the job he or she is seeking. Section 5 says that it shall be an unlawful discriminatory practice for an employer to discriminate against any one "because of" a non-job related handicap or disability. To us, this statutory language speaks in terms of handicaps and disabilities now existing, for if one has no handicap or disability then there is no condition which could "substantially interfere with the ability to perform the essential functions of the employment which a *handicapped* person applies for. . . ." Section 4(p) of the Act, 43 P.S. §954(p) (emphasis added).

In the instant case, there is not even a scintilla of evidence that on April 26, 1977 Ms. English was handicapped or disabled in *any* manner. She had none of the diseases, none of the physical restrictions, none of the psychological characteristics and, indeed, none of the breathing difficulties to which the medical testimony indicated that she, as a morbidly obese person, was *potentially* susceptible. The physician who examined Ms. English on September 8, 1977 at the request of HRC, Dr. Chirico, testified that Ms. English had no gastrointestinal problems, no cardiovascular disease or history, no hypertension, no pulmonary disease and no peripheral edema. The physician concluded by saying that there was nothing physically wrong with Ms. English that would prevent her from performing any of the duties of the job she was seeking.

As we have already noted, Ms. English said in her deposition that she was perfectly able to do a regular

day's work at all times and that work had never bothered her. PECO has admitted that Ms. English could perform the duties of Customer Service Representative.

On the basis of this summary of the evidence we must conclude that on April 26, 1977 Joyce English had no non-job related disability or handicap whatsoever.

It is true, again as we have already noted, that both HRC and PECO have introduced evidence that Ms. English may be handicapped or disabled some day because she is morbidly obese, but it would seem fair to say that every applicant for employment has *some* potential for handicap or disability and to use any criteria other than the applicant's present condition for a determination of whether or not that person is handicapped or disabled would be to transfer the language of the Act into a universal discrimination law.

Although we have concluded that it is the applicant's *present* condition which is crucial in determining whether a handicap exists, we note that the HRC found additional support for its conclusion that Ms. English was handicapped by concluding that PECO "*regarded*" Ms. English as having a handicap. In order to reach the conclusion that Ms. English was handicapped because PECO regarded her as such, the HRC applied a portion of its regulations which defines a handicapped or disabled person as a person who "is regarded as having [a physical or mental impairment which substantially limits one or more major life activities]." Such an impairment is further defined, in part, as one which "does not substantially limit major life activities but that is treated by an employer . . . as constituting such a limitation. . . ." 16 Pa. Code §44.4.

As previously noted, these regulations were not adopted at the time the instant proceedings were ini-

tiated. While we have found a portion of the definition useful insofar as we believe it reflects the common usage of the terms, the above cited portion cannot be considered as a commonly approved definition of handicap. Since this broad definition of handicap was not promulgated until 1978, it is not applicable to this case. *See Community County Day School v. Department of Education*, 51 Pa. Commonwealth Ct. 286, 414 A.2d 428 (1980).

We hold that Joyce English has failed to prove that she was handicapped or disabled within the meaning of the Act at the time she applied for employment with PECO.[9]

## DID PECO DISCRIMINATE AGAINST JOYCE ENGLISH BECAUSE SHE WAS A HANDICAPPED PERSON?

While this issue has already been resolved because we have held that as a matter of law Joyce English was *not* a disabled or handicapped person, we are of the opinion that a little more may need to be said about PECO's actions in this case.

It has always been the rule that an employer may be selective about the persons he employs as long as he does not *unlawfully* discriminate among the applicants. Discrimination is an ugly condition in society and one who discriminates unlawfully is and should be subject to civil and sometimes even criminal penalties. But, of course, not all discrimination is unlawful. An employer who refuses to hire someone solely

---

[9] Because of our conclusion in this respect, one matter discussed in the briefs and argued before us need not be reached in this opinion. PECO argues that in some cases, morbid obesity may be voluntary and the Act ought to be interpreted as applying to involuntary handicaps only. This could be a critical factor in some cases, but in view of our conclusion, *supra*, that Ms. English was not handicapped or disabled it is not necessary for us to discuss the voluntariness issue.

because that person fails pre-employment tests is discriminating against that person, but not unlawfully.

As we have noted, PECO applied its weight chart to *all* applicants. The chart has not been attacked as unreasonable. PECO added substantial tolerances on either side of the recommended weight. Persons who exceeded those tolerances were thought to be high risks for absenteeism and low productivity. An employer has a substantial interest in the matters of the absenteeism and productivity of its employees. We believe that an employer has the inherent right to discriminate among applicants for employment and to eliminate those who have a high potential for absenteeism and low productivity.[10]

In the instant case, PECO says it refused to hire Ms. English because she failed to meet its medical standards. Ms. English and HRC say PECO did not hire Ms. English because she was handicapped. In light of all the testimony we have reviewed in this opinion and especially that relating to the difficulty in ascertaining whether or not Ms. English was a handicapped person within the meaning of the Act, we cannot say as a matter of law that PECO on April 26, 1977 unlawfully discriminated against Joyce English.

Order reversed.

## ORDER

It is ordered that the order of the Pennsylvania Human Relations Commission dated March 31, 1980 be and the same is reversed.

---

[10] *See Metropolitan Dade County v. Wolf*, 274 So. 2d 584, *cert. denied*, 414 U.S. 1116 (1973) (weight regulations are grounded on business necessity and compliance therewith may be made a condition of employment due to the likelihood that an obese person will become disabled during employment).