518 A.2d 610

Action Industries, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Human Relations Commission, Respondent.

Argued October 6, 1986, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Jon Hogue, Titus, Marcus & Shapira,* with him, *Linda S. Wilson,* for petitioner.

*Marianne Sara Malloy,* Assistant General Counsel, with her, *Elisabeth S. Shuster,* General Counsel, for respondent.

OPINION BY JUDGE DOYLE, December 5, 1986:

This is an appeal by Action Industries, Inc. (Action) from an order of the Pennsylvania Human Relations Commission (Commission) which adopted the findings, opinion and conclusion of its hearing examiner, who determined that Action had violated Section 5 of the Pennsylvania Human Relations Act (Act)[1] by discriminating against a job applicant on the basis of a non-job-related handicap or disability.

The facts in this case are not in dispute. On May 18, 1982, Timothy Vogt applied for a position as a temporary warehouse worker with Action, an importer, manufacturer and distributor of household products, plastics and light bulbs. This position involves heavy manual labor including the regular lifting of loads of up to 65 pounds. Vogt was interviewed on July 12, 1982 and was given a conditional offer of employment provided that he would undergo a pre-employment health evaluation and obtain a recommendation of employment from the examining physician. The examination was performed by Dr. Daniel Welsh, M.D., a physiatrist. This individual was not an employee of Action, but worked for Harmarville Rehabilitation Center, with which Action had entered into an agreement to perform physical examinations for all applicants for warehouse positions. Action had initiated this policy after determining that a disproportionately high number of warehouse employees sustained work-related injuries.

Dr. Welsh's examination revealed that Vogt had rotary lateral scoliosis of the spine. The doctor therefore

_____

[1] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955.

concluded that Vogt should not do heavy lifting and advised Action that he could not recommend Vogt for the position. Accordingly, Action declined to offer the job to Vogt. It is undisputed that Dr. Welsh's findings and opinion constituted the sole reason why Action refused Vogt employment.

Vogt filed a complaint before the Commission which, subsequent to its investigation, found probable cause to credit his complaint.[2] After attempts to conciliate failed,[3] a public hearing was scheduled and the hearing officer determined that Vogt had established a *prima facie* case of discrimination by demonstrating:

1. That he was a member of a protected minority;

2. That he applied for a job for which he was otherwise qualified;

3. That his application was rejected because of his handicap; and

4. That the employer continued to seek qualified applicants.

*See National Railroad Passenger Corp. (Amtrak) v. Pennsylvania Human Relations Commission*, 70 Pa. Commonwealth Ct. 62, 452 A.2d 301 (1982).

Vogt's status as a protected minority emanates from Section 5(a) of the Act which prohibits discrimination based upon a non-job-related handicap or disability. The Commission has promulgated a regulation defining a handicapped or disabled person. This regulation reads in pertinent part as follows:

*Handicapped or disabled person*—Includes the following:

(i) A person who:

(A) has a physical or mental impairment which substantially limits one or more major life activities;

---

[2] *See* Section 9 of the Act, 43 P.S. §959.

[3] *See id.*

(B)   has a record of such an impairment; or

(C)   is regarded as having such an impairment.

(ii)   As used in subparagraph (i) of this paragraph, the phrase:

(A)   'physical or mental impairment' means a physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin, and endocrine or a mental or psychological disorder, such as mental illness, and specific learning disabilities.

(B)   'major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(C)   'has a record of such an impairment' means has a history of or has been misclassified as having a mental or physical impairment that substantially limits one or more major life activities.

(D)   'is regarded as having an impairment' means has a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer or owner, operator, or provider of a public accommodation as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or has none of the impairments defined in subparagraph (i)(A) of this paragraph but is treated by an employer or owner, operator, or provider of a public accommodation as having such an impairment.

*Non-job-related handicap or disability*—Includes the following:

(i) Any handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in, or has been engaged in. Uninsurability or increased cost of insurance under a group or employe insurance plan does not render a handicap or disability job-related.

(ii) A handicap or disability is not job-related merely because the job may pose a threat of harm to the employe or applicant with the handicap or disability unless the threat is one of demonstrable and serious harm.

(iii) A handicap or disability may be job-related if placing the handicapped or disabled employe or applicant in the job would pose a demonstrable threat of harm to the health and safety of others.

16 Pa. Code §44.4.

The hearing examiner found that Action rebutted Vogt's *prima facie* case by proffering a legitimate nondiscriminatory reason for its action. *See Smith v. B & O R.R. Co.*, 90 Pa. Commonwealth Ct. 186, 494 A.2d 1161 (1985). The burden then shifted back to Vogt to demonstrate that Action's proffered reason was merely a pretext and that Vogt was a victim of intentional discrimination. *Id.* In support of this burden, Vogt presented the testimony of two doctors, one of whom examined him and the other of whom reviewed his records. These individuals first saw Vogt after the investigation by the Commission had begun. The sum and substance of their testimony was that, although Vogt did have the condition diagnosed by Dr. Welsh, it would not preclude Vogt from fully performing his job without any

increased risk of injury. The Commission credited the testimony of Vogt's medical witnesses over that of Action's and ruled that Vogt had established the pretextual nature of Action's rebutting evidence. Accordingly, the Commission ordered, *inter alia,* that Vogt receive a lump-sum payment of $21,225.00, plus interest of six percent per annum calculated from the date of refusal to hire, and that Action offer Vogt the next available position as a temporary warehouse worker. This appeal ensued.

On appeal we must consider whether the Commission acted properly in considering and relying upon the testimony of the two doctors as evidence to show that Action's reason for refusing to hire Vogt was pretextual. Phrased differently, the precise issue before us is whether an employer who has refused to hire an individual based upon the employer's perception of a job-related handicap has a legal defense under Commission Regulation 44.4 to a charge of discrimination, where the employer's perception and determination not to hire stemmed from its reliance upon the opinion of a medical expert.

We begin our analysis by recognizing that in this case of alleged disparate treatment discrimination[4] the complainant in order to rebut the employer's defense must show that the employer's reason for not hiring was pretextual and that the complainant was a victim of intentional discrimination. *Smith; International Brotherhood of Teamsters v. United States,* 431 U.S. 324 (1977). This burden can be met "directly by persuading the

---

[4] For an excellent analysis of the distinctions between disparate impact discrimination and disparate treatment discrimination, only the latter of which requires the complainant to demonstrate intent, *see Winn v. Trans World Airlines, Inc.,* 506 Pa. 138, 147, 484 A.2d 392, 397 (1984) (LARSEN, J., opinion in support of affirmance).

court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citation omitted). Central to establishing discriminatory intent is the mind-set of the employer at the time of its alleged discriminatory conduct. Thus, the fact that, subsequent to the applicant's rejection certain facts of which the employer was previously unaware come to light, cannot operate to create retroactively an intent to discriminate. We therefore believe that in cases of disparate treatment based upon handicap or disability, an employer can have a good-faith defense which negates its intent to discriminate where it *reasonably* relies upon the opinion of a medical expert in refusing to hire an applicant.

This is not to say that in cases involving handicap discrimination an employer can always insulate itself by having a physician "sign off" on all hiring decisions. A complainant could still show, for example, that reliance upon the doctor's opinion was unreasonable under the circumstances, that the employer paid the doctor only if a prospective employee was found to be unsuitable, or that an employer advised the doctor to declare all blacks, women, etc. "unfit." In these situations intent to discriminate could legally exist. While we understand the Commission's concern that permitting physicians to make what are, in effect, hiring decisions may insulate employers from liability, the effect of its decision in this case would be devastating in the labor field inasmuch as it is virtually certain that, except in the most extreme cases, contradictory medical opinions will exist. The fact that a complainant can find a doctor to contradict the opinion of an employer's doctor, which the employer reasonably relied upon in good faith, should not give rise to liability, nor do we believe that the Act intended such a result. As Judge MACPHAIL astutely noted in *Pennsylvania State Police v. Pennsylvania Human Rela-*

*tions Commission,* 72 Pa. Commonwealth Ct. 520, 530 n.12, 457 A.2d 584, 589-90 n.12 (1983):

> If an Employer rejects an applicant for medical reasons, that act under the Commission's regulations is an impairment, per se, of a major life activity, *i.e.* employment. Unless the employer, therefore, can show that the physical condition is job-related, a burden not easy to meet, *see National Railroad Passenger Corp.,* the employer faces the probability of defending a complaint under the Act. While we are well aware of the laudable purpose of the Act to foster the full employment of all our citizens regardless of the race, color, religious creed, ancestry, handicap or disability, . . . we do not believe that an employer's rejection of an applicant based upon a recommendation of its medical expert which has some basis in fact, is discrimination as that term is understood and has been applied to conditions of race, color, religious creed or ancestry.

Based upon the foregoing analysis, we hold that, under Commission Regulation 44.4, a complainant who presents medical evidence favorable to him, which evidence was unknown to the employer at the time of the refusal to hire, does not negate an employer's showing of a non-pretextual reason for refusing to hire an employee it perceived as handicapped or disabled, where the employer has demonstrated that it reasonably relied upon the advice of a medical expert in forming its perception and, for that reason alone, rejected the candidate.

The order of the Commission is reversed.

### Order

Now, December 5, 1986, the order of the Pennsylvania Human Relations Commission in the above-captioned matter dated November 27, 1985 is hereby reversed.