556 A.2d 479

Johnstown Redevelopment Authority, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent.

Argued May 23, 1988, before Judges CRAIG and MC-GINLEY, and Senior Judge NARICK, sitting as a panel of three.

*William W. Barbin,* Solicitor, for petitioner.

*Theresa Homisak,* Counsel, with her, *Francine Ostrovsky,* Assistant Chief Counsel, and *Elisabeth S. Shuster,* Chief Counsel, for respondent.

OPINION BY JUDGE MCGINLEY, March 22, 1989:

Johnstown Redevelopment Authority (Authority) appeals an order of the Pennsylvania Human Relations Commission (Commission) which ordered the Authority to cease discrimination on the basis of race and to pay Eula Morris (Morris) a lump sum of $22,265.98 plus interest.

On April 25, 1983, Morris, a 53 year old black female, filed a complaint against the Authority alleging that the Authority violated Section 5(a) of the Pennsylvania Human Relations Act (Act),[1] by refusing to hire her because of her race. The complaint was investigated by the Commission and a probable cause finding was made. Thereafter, attempts to amicably resolve the matter were unsuccessful. On February 18, 1987, the hearing examiner conducted a public hearing and subsequently recommended a decision in favor of Morris concluding that Morris had presented a *prima facie* case of disparate treatment discrimination which the Authority failed to properly rebut. The Commission adopted the findings, conclusions, opinion and recommendation of the hearing examiner and entered a final order directing the Authority to cease and desist from discriminating on the basis of race and to pay $22,265.98 plus interest to Morris as back pay. The Authority now appeals to our Court.

---

[1] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a).

The Commission made the following pertinent Findings of Fact:

3. For the 3 year period between 1977 to 1980, the Complainant worked as a Secretary for a local church with such duties as answering phones, maintaining financial records, recording meetings, typing stencils and running a mimeograph machine. (N.T. 11)

4. From December 23, 1980 to July 27, 1981, the Complainant worked as a Secretary for a flood relief project called the Rifle Program where she primarily processed claims for reimbursement for flood damages. (N.T. 12)

5. In July 1981, the Complainant applied and was hired for a Clerk/Typist position with the Respondent. (N.T. 12, 14; C.E. 1)

6. The Complainant's general duties remained the same as the duties she performed when employed with the Rifle Program. (N.T. 13)

7. Although the Complainant's primary job responsibility remained processing flood damage claims, at some point during the Complainant's employment, she was required to assist the Respondent's switchboard operator. (N.T. 13)

8. Between December 1981, and August 1982, the Complainant and other secretaries took turns operating the switchboard when the switchboard operator was either off or at lunch. (N.T. 15, 28)

9. While employed by the Respondent, the Complainant received no complaints regarding her work, instead she was complimented. (N.T. 16)

10. On August 3, 1982, the Complainant was laid off. (N.T. 17)

11. On February 21, 23, and 25, 1983, the Johnstown Tribune-Democrat published a notice announcing that the Respondent would be distributing applications for the position of Switchboard Operator/Typist. (C.E. 6)

12. The newspaper announcement listed the qualifications for Switchboard operator Typist as: high school graduate or equivalent, one year experience as office clerical/recorder, switchboard exper- [sic] and typing of at least 40 words per minutes. [sic] (C.E. 6)

13. Shorthand ability was not a qualification requirement for [sic] the position. (N.T. 44, 49)

14. The Respondent's governing body was composed for five board members. (C.E. 5)

15. At a regularly scheduled meeting of the board, board member Gentile asked if prior employees had been contacted regarding the Switchboard Operator/Typist opening. (N.T. 42)

16. Despite board member Gentile's concern, the Respondent simply accepted applications from anyone, thereby providing former employees with no special advantage. (N.T. 42)

17. On March 1, 1983, the Complainant submitted an application for the Switchboard Operator/Typist position. (C.E. 4)

18. The Respondent received 43 applications for the position of Switchboard Operator/Typist: Thirty-seven applicants were White, six were Black. (N.T. 98)

19. The Respondent's Executive Director, Ronald Repak; the Administration Manager, Nancy Herald; and the Comptroller, William Meske, collec-

tively reviewed the 43 applications and recommended that four applicants be interviewed. (N.T. 46, 47, 64)

20. The Complainant was not selected to be interviewed. (N.T. 53)

21. Repak, Herald, and Meske based their selections totally on the information contained in the application forms received by the Respondent. (N.T. 66)

22. Applicants were eliminated from consideration if their application was either incomplete or contained insufficient information upon which to evaluate the applicants. (N.T. 67)

23. The Complainant's application was not incomplete and did contain sufficient information upon which to evaluate it. (N.T. 68)

24. Morris met the required qualifications for the position of Switchboard Operator/Typist. (N.T. 57)

25. Both Herald and Meske knew the Complainant prior to March 1983 because they were also Respondent employees and had worked with the Complainant prior to her layoff in August 1982. (N.T. 29, 30, 69, 73)

26. During the Public Hearing, Herald was specifically given an opportunity to compare the Complainant's application with the four individuals selected for interviews and to articulate a reason why the Complainant's application was rejected. (N.T. 79)

27. Herald stated that she could not remember why the Complainant was not selected. (N.T. 79, 80)

28. Deborah Kerr, the person recommended by the Respondent's Executive Director, Administrative Manager, and Comptroller and hired by the board for the Switchboard Operator/Typist position was White. (N.T. 57, 82)

29. Neither Kerr nor the three others selected to be interviewed had prior work experience with the Respondent. (N.T. 55, 56, 57)

30. The position of Switchboard Operator/Typist commenced on April 5, 1983 at a beginning salary of $7,020.00 per year. (C.E. 7)

31. After the Complainant was not hired, she unsuccessfully attempted to find other employment. (N.T. 19)

32. The Complainant testified that after December 1985, she was no longer able to work. (N.T. 19).

(Findings of Fact of the Commission, October 28, 1987 at 2-5.)[2]

The Authority argues that several of the Commission's findings of fact are unsupported by substantial evidence;[3] that the Commission failed to make findings as to all material issues of fact raised by the evidence;[4]

_____

[2] Within the Commission's opinion, and throughout this opinion, "N.T." refers to Notes of Testimony, February 18, 1987; "C.E." refers to Complainant's (Morris') Exhibits; "F.F." refers to the Commission's Findings of Fact, October 28, 1987.

[3] These findings are: those regarding the testimony of Nancy Herald (Herald), the Secretary of the Authority's Board and the Administrative Manager, concerning the selection procedures and the relative qualifications of the applicants; Morris' testimony concerning her job search activities after the challenged employment action; and Morris' testimony concerning when she became unable to work.

[4] Specifically, the Authority argues that the Commission failed to make findings regarding the credibility of the witnesses, the

that the Commission erred in its construction of a *prima facie* case of disparate treatment discrimination; that the Commission erred in its application of the rebuttable presumption arising from presentation of a *prima facie* case; and, finally, that the Authority is cloaked with governmental immunity and therefore liability may not be imposed.[5]

Our scope of review herein is limited to a determination of whether there was a violation of constitutional rights, an error of law, or whether the findings of fact necessary to support the adjudication are supported by substantial evidence. *Harrisburg School District v. Pennsylvania Human Relations Commission*, 77 Pa. Commonwealth Ct. 594, 466 A.2d 760 (1983). The task of weighing the evidence, both direct and circumstantial, to credit and discredit testimony, to draw inferences and make ultimate findings of fact as to whether a violation of the Act occurred is for the Commission. *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 116 Pa. Commonwealth Ct. 89, 542 A.2d 595 (1988). Of course, the Commission is a recognized expert in discrimination matters whose judgment will not be lightly substituted. *See Orweco Frocks v. Pennsylvania Human Relations Commission*, 113 Pa. Commonwealth Ct. 333, 537 A.2d 897 (1988).

In employment discrimination cases, a complainant is first required to establish a *prima facie* case of discrimination. The Pennsylvania Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976) adopted the

---

relative qualifications of Morris and those selected to be interviewed for the position instead of Morris, and the effects of the Authority's affirmative action plan on the hiring procedures followed in this case.

[5] The Authority has waived this governmental immunity argument for failure to raise this argument before the Commission. *See* Pa. R.A.P. 1551.

United States Supreme Court's analysis in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973) (a race based refusal to hire case) for establishing a *prima facie* case. This analysis requires the following: (1) the complainant belongs to a racial minority; (2) he applied for a job for which the employer was seeking applicants; (3) despite his qualifications, he was not hired; and (4) after the rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell-Douglas* at 802; *General Electric Corp.,* 469 Pa. at 304-306, 365 A.2d at 655-656. This *prima facie* test is adaptable to accommodate differences in the nature of the discrimination alleged. *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 532 A.2d 315 (1987). "The form it takes, however, must be appropriate to its function, which is to 'eliminate[ ] the most common nondiscriminatory reasons' for the employer's action." *Allegheny Housing,* 516 Pa. at 129, 532 A.2d at 318 quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981).

In the case *sub judice,* the Commission set forth the following criteria which Morris was required to show in order to establish a *prima facie* case: (1) that Morris was a member of a racial minority; (2) that Morris applied for and was qualified for a job for which the Authority was seeking applicants; (3) that Morris was rejected; and (4) that the rejection was under circumstances which give rise to an inference of discrimination. (*See* Conclusion of Law No. 5 of the Commission, October 28, 1987, at 6.) The Authority contends that Morris' *prima facie* case is flawed because the Commission did not require Morris to produce evidence that she was the most qualified applicant for the position. However, in *General Electric Corp.,* the Pennsylvania Supreme Court held that the

"best able and most competent" clause of Section 5(a) of the Act is an expression of the business necessity doctrine, the purpose of which is to protect employers from having to select employees who do not meet their qualification standards. *General Electric Corp.*, 469 Pa. at 306-307, 365 A.2d at 656-57. Therefore, the burden of proving that a complainant is not the best able and most competent is on the employer. *Id.*

Our Supreme Court recently stated in *Allegheny Housing* that the burden of establishing a *prima facie* case is not an onerous one. The Court explained:

This is because the nature of the burden that 'shifts' to the defendant when a *prima facie* case is established is simply to produce evidence of a 'legitimate, non-discriminatory reason' for the discharge. ... If such evidence is presented, the question for the Commission is whether, on *all* the evidence produced, the plaintiff has persuaded it by a preponderance of the evidence that the employer intentionally discriminated against her. Whether the plaintiff must eliminate a certain non-discriminatory reason as part of making a *prima facie* case, or discredit the evidence of that same reason produced by the employer after plaintiff's *prima facie* case has been made, the result is the same; the plaintiff must persuade the factfinder by a preponderance of the evidence. (Citations omitted.)

*Allegheny Housing*, 516 Pa. at 129-130, 532 A.2d at 318.

In *Allegheny Housing*, the Supreme Court further explained the evidentiary guidelines to be followed in employment discrimination cases:

Nothing about the Human Relations Act removes its operation from the bedrock concept of our

jurisprudence that one who alleges wrongdoing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. Absent a response, the 'presumption' of discrimination arising from the plaintiff's *prima facie* case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a *prima facie* case. If, however, the defendant offers a non-discriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then 'decide which party's explanation of the employer's motivation it believes'. ... The plaintiff is, of course, free to present evidence and argument that the explanation offered by the employer is not worthy of belief or is otherwise inadequate in order to persuade the tribunal that her evidence does preponderate to prove discrimination. She is not, however, entitled to be aided

by a presumption of discrimination against which the employer's proof must 'measure up.' (Citation omitted.)

*Allegheny Housing,* 516 Pa. at 131, 532 A.2d at 319.

Thus, Morris must initially produce sufficient evidence that, if believed, indicates that more likely than not discrimination has occurred. *Allegheny Housing.*

In the matter herein, Findings of Fact Nos. 1-25 and 28-30, as set forth herein, are undisputed. The Commission found that these facts establish a *prima facie* case of discrimination, thereby putting the Authority in a position to offer a legitimate, nondiscriminatory reason for its action. The Authority argues the Commission erred in its initial determination that Morris established a *prima facie* case. We agree. The Commission stated:

> Therefore, having established what the Complaint must first show, we readily see that the Complainant has met her initial burden. There is no question that she belongs to a racial minority, and there is no doubt that she applied for an open position. The Respondent also concedes that the Complainant met the qualifications of the job. Equally clear is the fact that the Complainant was rejected.

> The fourth element of the *prima facie* showing has been met since the Complainant presented evidence that *she had been a prior employee of the Respondent who had in fact done the exact job almost on a daily basis for approximately 9 months.* None of the four applicants chosen for an interview had ever worked for the Respondent before. Added to this simple fact are the additional circumstances. That *two of the reviewing committee members had known the Complainant while she was a prior employee* and the Complain-

ant had received no complaints and was complimented on her work performance.
Commission Opinion at 20 (emphasis added).

Morris argues that because two committee members knew she previously worked with the Authority as a switchboard operator and because she fulfilled all the minimum qualifications, she was the best able and most qualified for this job. However, the record indicates that Morris was not formerly employed by the Authority as a switchboard operator/typist. Morris testified she was a clerk/typist whose primary job responsibilities involved the processing of reimbursement claims. (N.T. at 11-13.) Furthermore, although two of the members of the selection committee knew Morris was previously employed by the Authority, Morris testified the members did not previously supervise her and, also that the members did not have the opportunity to evaluate her work performance. (N.T. at 26-27.) Moreover, the clear and uncontroverted testimony of Herald was that only the information on the 1983 job applications was considered by the committee in selecting applicants to be interviewed, and much of the information Morris testified to before the Commission was not contained in her 1983 application. Authority personnel files were not reviewed; former employees were given no preference; nor were they treated differently in any way. (N.T. at 62-63.) Morris argues, and the Commission found, that unspecified persons complimented her work during her former employment with the Authority. However, this has no bearing on the issue of whether the committee discriminated against Morris because this information was not presented to or considered by the committee in selecting applicants to be interviewed. Morris' testimony regarding specific incidents of her work experience have no bearing on the issue of whether the selection committee discriminated against

Morris because Morris merely described her duties as "typing, filing, worked switchboard, kept financial records, took applications." (*See* Morris' application at C-1a of the Reproduced Record (RR); *Action Industries v. Pennsylvania Human Relations Commission*, 102 Pa. Commonwealth Ct. 382, 518 A.2d 610 (1986).) Morris has not established any duty on the part of the Authority to review personnel records, review prior employment applications, or provide hiring preferences to former employees. (*See* N.T. at 44.) Practically, we recognize that with the large number of applications received, there is no impropriety attached to a review procedure that is restricted to the submitted applications and the information contained therein.

The Commission concluded that a reasonable inference of discrimination arose based solely upon a determination that Morris possessed a qualification which the other successful applicants did not, to wit, former employment with the Authority. In *Farrell Area School District v. Deiger*, 88 Pa. Commonwealth Ct. 431, 439, 490 A.2d 474, 479 (1985) our Court held that:

> [I]n order for a white male to establish a prima facie case of employment discrimination, he 'must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.' Burdine, 450 U.S. at 253, [101 S.Ct. at 1094].
>
> The primary reason for having Complainant establish a prima facie case is to eliminate the most obvious nondiscriminatory reasons why he was not hired. Id. at 253-54.

In *Farrell*, Deiger, a white male, successfully convinced the Commission that the circumstances surround-

ing a company's failure to hire him gave rise to an inference of unlawful discrimination. On appeal our Court disagreed. After review of the record the Court concluded that it was not established that Dieger and Ms. Woodbridge, the successful applicant, were treated differently by the company during the employee selection process. The Court determined that Deiger failed to meet his initial burden to establish a *prima facie* case. It explained:

> Although Complainant had a college degree in elementary education and several more credits in early childhood education than did Ms. Woodbridge, the latter's college degree in art education did not render her unqualified. Indeed, DPW approved her as qualified to fill the position. Furthermore, a review of the transcripts of the two applicants shows that Ms. Woodbridge had the better academic record. The most that we can say, on this record and the facts that were found by the Commission, is that the applicants were *differently* qualified for the position which they sought. 'It has always been the rule that an employer may be selective about the persons he employs as long as he does not *unlawfully* discriminate among the applicants.' Philadelphia Electric Co. v. Pennsylvania Human Relations Commission, 68 Pa. Commonwealth Ct. 212, 227, 448 A.2d 701, 708 (1982) (emphasis in original).

*Farrell,* 88 Pa. Commonwealth Ct. at 440, 490 A.2d at 479 (emphasis in original). Accordingly, in the case *sub judice,* the fact that Morris was once employed by the Authority does not establish a reasonable inference of discrimination by the Authority and Morris has failed to

meet her initial burden to establish a *prima facie* case. *Allegheny Housing*. We reverse the decision of the commission.

### ORDER

AND NOW, this 22nd day of March, 1989, the order of the Pennsylvania Human Relations Commission dated October 28, 1987, at Docket No. E-25389D is hereby reversed.

Judge MACPHAIL did not participate in the decision in this case.

---

### DISSENTING OPINION BY JUDGE CRAIG:

This court should not approve a principle which would permit an employer to ignore available information concerning a formerly employed minority applicant's qualifications so as to thwart that applicant from being able to establish a *prima facie* case of discrimination with respect to refusal to rehire.

Under *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987), and *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976), the elements of a *prima facie* case consist of proof that the complainant (1) belongs to a racial minority, (2) applied for a job opening, (3) was rejected despite being qualified and thereby (4) was subjected to discrimination as against other applicants. With such a *prima facie* case established, the complainant prevails if the employer does not meet its burden of supplying a satisfactory explanation for the rejection.

The key question in this case is whether the complainant proved that she was rejected despite being qualified for a receptionist position. As the Pennsylvania Human Relations Commission found, the complainant, as a former employee laid off through no fault of her own,

had demonstrated her qualifications for the Switchboard Operator Typist position because, while formerly employed as a typist, she had actually performed the switchboard operator functions in a satisfactory manner.

The employer authority, through its personnel, necessarily possessed knowledge of the complainant's previous qualifying experience. This court should not permit the authority's hiring committee to restrict the scope of its own vision by holding that:

> [T]here is no impropriety attached to a review procedure that is restricted to the submitted applications and the information contained therein.

We should not confer our imprimatur on any hiring procedure which can be "restricted" by the hiring body to considerations of its own choosing.

Moreover, the complainant's application, as this court quotes it, included the statement that she had indeed "worked switchboard" in the past. Although briefly stated, that information did more than put the hiring body on notice to investigate further; it informed the hiring body that the identified applicant, who was personally known as a former employee to two members of that body (Finding of Fact No. 25), had previous experience which was quite appropriate, because it was in precisely the kind of work involved.

Because the commission's findings are supported by substantial evidence, because the complainant's *prima facie* case was complete, and because the employer offered no explanation for the rejection other than an acknowledgment that the hiring body subjected itself to vision-narrowing blinders, the commission's decision should be affirmed.