MARILEE PAYTON TALMAN, COMPLAINANT-RESPONDENT, v. BOARD OF TRUSTEES OF BURLINGTON COUNTY COLLEGE, ROBERT WELSH AND JAMES CUNNINGHAM, RESPONDENTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued Apirl 30, 1979—Decided July 31, 1979.

536

Before Judges FRITZ, BISCHOFF and MORGAN.

*Mr. Myron H. Gottlieb* argued the cause for appellants (*Messrs. Kessler, Tutek* and *Gottlieb,* attorneys).

*Ms. Cynthia M. Jacob* argued the cause for respondent Talman (*Messrs. Norris, McLaughlin & Marcus,* attorneys).

*Ms. Katherine L. Suga,* Deputy Attorney General, argued the cause for respondent Division on Civil Rights (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mrs. Erminie L. Conley,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

FRITZ, P. J. A. D. In this sex discrimination matter respondents appeal from an order of the Director of the Division on Civil Rights (Director) adopting the hearing examiner's recommended findings of fact and conclusions of law determining that respondents unlawfully discriminated against complainant in employment at respondent college on account of sex, in violation of the Law Against Discrimination, *N. J. S. A.* 10:5–4 and 10:5–12(a). The order awarded complainant compensatory damages including pain and humiliation damages, directed respondent college to cease and desist from discrimination and imposed certain sanctions and directions in connection therewith. Respondents contend that (1) the Director of the Division erred in his consideration and use of statistics; (2) the evidence was insufficient to support the findings of discrimination; (3) the award of damages was improper, and (4) the affirmative action aspect of the order was improper.

We are wholly satisfied that the finding of illegal discrimination might reasonably have been reached from sufficient credible evidence in the whole record, and as to that we affirm. *Mayflower Securities v. Bureau of Securities,* 64 *N. J.* 85 (1973); *Flanders v. William Paterson College of N. J.,* 163 *N. J. Super.* 225, 230–231 (App. Div. 1976).

We are also satisfied that the award of damages for pain and humiliation was proper, *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399 (1973), and that the amount awarded was entirely reasonable. *Castellano v. Linden Bd. of Ed.,* 79 *N. J.* 407 (1979), is entirely distinguishable on the facts.

There are two areas in which we believe the order must be modified.

First, we are of the opinion that the compensatory damages are overstated. We are aware that public policy arguments exists reducing the burden of mitigation of damages in the civil rights context, but New Jersey has not gone that far, nor do we here. *Harvard v. Bushberg Bros.,* 137 *N. J. Super.* 537, 542 (App. Div. 1975), petition and cross-petition for certif. granted, 71 *N. J.* 493 (1976).[1] We do not doubt, as suggested by the hearing officer below, that in ordinary contract actions defendant has an evidential burden with respect to the obligation of plaintiff to mitigate damages. *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.,* 141 *N. J. Super.* 437, 455 (App. Div. 1976), certif. den. 71 *N. J.* 503 (1976). But the civil rights action is not an ordinary contract action. The contract "product" is not a fungible, like others available to be bought and sold on the open market. Rather it concerns a person, with his or her abilities and inclinations, his or her strengths and frailties, all in the sensitive context of alleged discrimination and the frustration, acrimony and bilaterally retributive pressures generally implicated therein. In such a situation

---

[1] It appears from Supreme Court records that the petition and cross-petition were voluntarily dismissed by stipulation of the parties prior to consideration and determination of them by that Court.

we think sound application of a mitigation doctrine requires a fine balancing by the trier of the facts: a reasonable and responsible effort on the part of the one wronged to replace that of which that person has been deprived, against proof in the whole record from whatever source respecting the availability of replacement. We believe both parties should share this burden, but neither should be overwhelmed with it. Justice will be best served in these cases by a determination soundly grounded in the "feel" of the proofs.

We have canvassed the record with these guidelines in mind. Two things appear. First, there is some evidence of a dearth in available teaching positions. Secondly, respondent did essentially nothing to seek out any that were there. Remembering that the complaint was filed in February 1974 and that the hearing officer reasonably found (and was supported in the finding by the Director) that the discrimination, for our purposes, dated from "the beginning of the 1973 Fall semester (September 1973)," we listen to respondent telling what she did:

Q. Ms. Talman, could you describe to Mr. Wildstein your reacaction to the problems you had encountered at Burlington County College?
A. * * * I was completely discouraged, I felt once again I've missed an academic year, and I did talk to the husband of a friend of him who was teaching at Gloucester County, just very informally, and he said, "No, that nobody was hiring", and I just was completely discouraged.
Q. Did you try to secure a position for say beginning the Winter of 1974?
A. *All I did was talk to this one person.* That seemed to be the next closest college, and I just based it on what he said and what I knew from my own experience, that most of the hiring was done either in the late spring or the summer for the academic year beginning in September. I just thought it was hopeless, that there was no point in going around and talking to everybody, because there wouldn't be any jobs until September.

THE HEARER: You're talking about the time frame in January or February?
THE WITNESS: 1974.
THE HEARER: March and so forth?
THE WITNESS: 1974, yes.

A. (Continuing) Also, at that time I knew the College had received a copy of my complaint, and I knew, that I had heard from other people at the College that they were very angry about it, and I figured they would never hire me again, and if anyone contacted them even for recommendations, that they would not only not give a recommendation, they would probably make up something negative.

\* \* \*

Q. Why did you not secure another teaching job?

A. Finally, I just gave up hope about getting a teaching job in that area of New Jersey where I was living, there were only so many schools there, so I decided to leave the area and try to get a job somewhere else, so I moved to New York, because that's where the Army would move me.

THE HEARER: What's the last part?

THE WITNESS: That's where the Army would move me.

A. (Continuing) My husband had moved to New York, and I had to go where he was going.

THE HEARER: He's in the Army?

THE WITNESS: He was just getting out at that time.

A. (Continuing) So, I moved to New York, and *then I only talked to maybe three or four people*, women who were living in the New York area, and several of whom had PhD's, actually more than I did, and was *just informally asking about the job situation*, and they were all completely negative. I mean they just said the competition is terrible, that there are less and less jobs, it is just impossible, so I was just completely discouraged and I didn't know what to do.

Q. What did you ultimately decide to do?

A. Well, ultimately I decided I would just give up teaching, that it was just hopeless, that I would try to figure out another field that I was interested in and pursue that, but it was just terribly discouraging. I had to really evaluate everything, and I was extremely depressed for many months. I started to go see a therapist.
[Emphasis supplied.]

■ We hold no brief for discriminatory conduct. We enthuse in our support for the Law Against Discrimination. But we also believe it would profane the estimable policy and purpose of that enactment were it to result in a sinecure to one offended by an act of discrimination. So-called "mitigation" of damages is really not that at all, but a means for

measuring the real net loss of a plaintiff. This being so plaintiff must not contribute to or prolong that loss. So a further rule of law emerges which requires a plaintiff to act reasonably toward "mitigation," *i. e.,* toward insuring that defendant's loss will be minimized. Put another way, "certain acts or failures to act of [the injured party] are taken into account in computing the amount of his recovery." *White v. North Bergen Tp.,* 77 *N. J.* 538, 546 (1978).

We have endeavored to examine that accounting here and are not satisfied that plaintiff should recover compensatory damages to the extent allowed below. We do agree with the finding of the hearing officer that "the proofs in this case do not establish the Complainant's actions and conduct were so deficient or unreasonable within the totality of the circumstances presented, as to justify a denial of back pay," if he means in that context, to justify a denial of all back pay, for compensatory damages are available for deprivation of civil rights even in the absence of proof, for instance, of any out-of-pocket expenses. *Endress v. Brookdale Community College,* 144 *N. J. Super.* 109, 142 (App. Div. 1976). But we do not find the statement below tenable if it is read to mean (as we believe it was in fact meant) that complainant's conduct was such as to justify pay for the entire period until she chose to return to the working population. Put in rather basic terms, we are not satisfied that "talk[ing] to the husband of a friend" on one occasion and to "maybe three or four people * * * informally" on another is enough.

Accordingly, "in the interests of fairness and equity" (*White v. North Bergen Tp., supra,* 77 *N. J.* at 546) we will modify the back pay period computed below to extend no further than the nominal beginning of the next school year following the filing of plaintiff's complaint, *viz.,* September 1, 1974.

Our second concern is with the sanctions. The sanctions imposed are weighty almost to the extent of being predominantly punitive. But the powers of the Director in this regard are broad and his discretion in fashioning and

imposing remedies he believes will be effective to accomplish his mission allows him wide latitude. *Polk v. Cherry Hill Apartments, Inc.,* 62 *N. J.* 55, 58 (1972). Even so, he may not by his orders produce discrimination, and this is what we believe occurs in so much of his order as requires preferential treatment for women *"before giving consideration* to any and all men who have substantially similar qualifications." (Emphasis supplied.) Accordingly, we strike from the order those sanctions imposed by paragraphs 3(b) and 4(d).

Except as thus modified with regard to back pay and paragraphs 3(b) and 4(d) the order below is affirmed. We remand the matter to the Division for recomputation of damages limited to the period from September 1, 1973 to August 31, 1974. Fringe benefits for the period covered, out-of-pocket expenses and pain and humiliation damages are to be added, of course, and interest is to be computed as originally. We do not retain jurisdiction. No costs.