250 N.J. Super. 338 (1991)
594 A.2d 264
JOSEPH R. GIMELLO, COMPLAINANT-RESPONDENT,
v.
AGENCY RENT-A-CAR SYSTEMS, INC., RICK BRINDISI AND VINCENT GARRENTON, RESPONDENTS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1991.
Decided August 2, 1991.
*340 Before Judges KING, LONG and R.S. COHEN.
Maxine H. Neuhauser argued the cause for appellant Agency Rent-A-Car (Epstein, Becker & Green and Mackevich & Burke, attorneys; M. Elaine Jacoby and James E. Mackevich, of counsel; Maxine H. Neuhauser on the brief.
Joel S. Selikoff and Steven R. Cohen argued the cause for respondent Joseph R. Gimello (Selikoff & Cohen, attorneys; Joel S. Selikoff and Steven R. Cohen, of counsel and on the brief).
Lynn B. Norcia, Deputy Attorney General, argued the cause for respondent Division of Civil Rights (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lynn B. Norcia on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
In this case the complainant, Joseph Gimello, claimed that he was a victim of a discriminatory discharge from employment. He claimed that he was fired because of his obesity, a condition unrelated to his ability to do his job as office manager for a car rental agency. His employer claimed that he was terminated *341 because of inadequate job performance. The Director of the Division of Civil Rights, confirming the findings of the administrative law judge, concluded that the employer's reason for termination was pretextual, not bona fide, and that Gimello really was fired because of his actual or perceived obesity and not for any legitimate business reason. The employer now appeals this decision by the Director that Gimello was a victim of discrimination entitled to relief under our Law Against Discrimination, N.J.S.A. 10:5-1 to -42 (LAD or Law). We conclude that the record supports the decision of the Director. We affirm the adjudication of discrimination. We modify the damage award.

I
We summarize the highlights of the facts developed at the hearing in the Division of Civil Rights before Administrative Law Judge Duncan. Employer, Agency Rent-A-Car Systems, Inc. (Agency or employer), is a rental car agency with a principal office in Solon, Ohio. During 1978 and 1979, when Gimello started with Agency, it had about 130 offices throughout the country. At the time of the initial hearing in 1988, Agency had 493 offices nationally, including about 20 in New Jersey. Each office employed between two and five employees divided into two positions, office managers and management trainees. The job description of a manager trainee in the employer's manual states:
This is a two fold position; to deliver, prep and pick up rental units for our valued customers and to become actively involved in training and preparation for the management position.
The job description of an office manager states:
The office manager is responsible for organizing and coordinating the daily activities within their respective rental offices in accordance with standard company operating procedure, while working to expand the office through cooperative efforts with the sales representatives.
In addition, the office manager is responsible for the training and development of the manager trainee.
*342 The then-district manager Donald Mogar hired Gimello as a management trainee in Agency's Camden office on January 10, 1978. The two had known each other before the hiring because Mogar was friendly with Gimello's younger brother. Gimello had stated on his employment application that he was 5'8" and 225 pounds. One month later on February 16, 1978 Agency promoted Gimello to office manager in the Trenton office. At first no management trainees worked at the Trenton office but soon one was assigned to Gimello's supervision. His salary increased from $8,300 annually as a management trainee to $734 per month ($8,808 annually) as an office manager. Gimello received several raises in the following months. On April 16, 1978 Agency raised Gimello's salary to $776 per month ($9,312 annually); on June 1, 1978 to $818 per month ($9,816 annually); on August 16, 1978 to $860 per month ($10,320 annually); on November 16, 1978 to $900 per month ($10,800 annually), and on May 16, 1979 to $942 per month ($11,304 annually). The then-district manager Gary Gradl recommended the raises and commented favorably on Gimello's performance.
While Gimello worked at the Trenton office he also received several bonuses for maintaining high levels of sales of "Deductible Protection Coverage" (DPC). Agency's manual describes DPC as "extremely important" and "beneficial to Agency." Employees sell the coverage in connection with car insurance, explaining that the coverage "eliminates the $750 deductible on the physical damage coverage." The manual states that DPC costs the customer a flat fee of $3.50 a day plus tax. Offices attaining 55% or greater monthly DPC sales received bonuses from Agency. Gradl noted Gimello's high DPC sales percentages on the form reflecting Gimello's raises. Interoffice memoranda from James Thatcher, Agency's Eastern Regional Director, congratulated the offices for DPC sales and bonuses. The memos also contained handwritten personal notes of congratulations to Gimello from Thatcher. In June 1978 Gimello's Trenton office had 91.9% DPC sales and received a memo from Thatcher with the office's percentage circled and "Joe! Great" *343 written in the margin. On the memo showing the office's 100% sales quota "average through February 13, 1979" DPC sales, Thatcher wrote: "Joe: OUTSTANDING ... WHAT ELSE CAN I SAY. THANKS. JIM T." In March 1979, Gimello's office showed 102.5% (apparently a ratio of sales to sales quota) DPC sales and Thatcher wrote:
JOE: THIS IS A "COMPANY" ALL TIME RECORD  INCREDIBLE JOB. JIM T.
The memos from Thatcher for both February and March DPC sales noted that all regional offices qualified for the bonuses by achieving at least 55% DPC sales. On Gimello's memo reflecting March sales Thatcher circled the Trenton office's percentage and wrote "JOE!" next to the figure. The last memo reflects DPC sales through mid-April when Gimello's office showed DPC sales of 102.9%.
On June 11, 1979 Agency transferred Gimello to the Cherry Hill office. Gimello received a salary increase to $968 per month, or $11,616 annually. At the Cherry Hill office Gimello supervised three management trainees and a larger volume of business than at the Trenton office. Gimello's wife also worked at Agency's Cherry Hill office part-time starting in 1979. On November 1, 1979 Gimello received another raise, bringing his yearly salary to $1,008 per month or $12,100 annually. In January 1980 Agency instituted a program it called the "14/14 Incentive Bonus Plan" in which office managers would receive a $14,000 base salary plus monthly bonuses equalling 7% of the office's monthly net income. While Agency's memo stated that "only the most competent and experienced office managers will be offered participation in the plan[,]" its memo approving the salary changes indicated that all office managers in the Eastern Region participated in the new compensation program. Gimello's only truly bad month was February 1980 when he received just a 32¢ bonus. That figure seems to be an aberration, however, since in all other months he earned at least a few hundred dollars and once up to about $1,200.
*344 Agency also sent "Commendation Awards" to "those offices that have exceeded the highest level of competence in their respective markets." Gimello's Cherry Hill office received eight commendations from late 1979 through early 1983. Gimello also pointed to other letters from Agency's upper management in support of his performance as office manager. Sam Frankino, then chairman of Agency's board, commended Gimello and Mogar on "the fine performance of the Cherry Hill Office" in a May 15, 1981 letter. Another letter, dated August 9, 1982, accompanied a bonus check and complimented Gimello on the Cherry Hill office's "high performance."
The district manager for the territory including the Cherry Hill office managed the district from the Cherry Hill office location. Between June 1979 and June 1983 three district managers supervised Gimello: Lynn Tobiason (from June 1979 to sometime shortly after); Anthony Giannone (to October 1979); and Donald Mogar (to June 1983 when Gimello was fired). The only comment by Tobiason apparent in the record is in her recommendation of a raise for Gimello when he transferred from Trenton to Cherry Hill. Giannone complimented Gimello on his performance in September 1979 on a form reflecting one of Gimello's raises.
The record includes two evaluations of Gimello's performance compiled by Mogar. The first, dated December 8, 1981, described Gimello as a "good" office manager, but conditioned a recommendation for promotion on Gimello's taking a "course in employee/public relations." The second evaluation, dated May 1, 1982, contained more specific information: Mogar noted that Gimello should soften his telephone skills with customers and should try to manage dispatching and scheduling more efficiently. Mogar again recommended a course in "employee/public relations" but urged promotion more emphatically than he did in his December evaluation. Mogar explained at the hearing that he believed the course would improve Gimello's public speaking skills rather than his skills in dealing with employees. He testified that since a promotion to district manager would *345 give Gimello more opportunities to give speeches and go on "sales calls," the course would be an "asset."
Agency conducted several "audits" of the Cherry Hill office while Gimello was the office manager. These "audits" apparently are spot-checks of the office's cash, paperwork and procedures performed at two to five-month intervals from January 20, 1982 to March 30, 1983. The audits noted several problems with the office, including missing contracts, paperwork and contracts not completed correctly, and employees not requiring deposits on DPC purchases. The audits also showed that the "revenue" in the office was "off," but with discrepancies of only $1.50, $3, $17.50 and $4. In his comments on the audit, Gimello explained that the mistakes in revenue were due to trainees' carelessness. Gimello said that the rate of turnover in his Cherry Hill office was "heavy" and that "[m]any mistakes can be attributed to [the] turnover of trainees."
In the spring of 1982, Richard Brindisi became Regional Director for the area, including the Cherry Hill office. Gimello stated that although he spoke to Brindisi "frequently" on the phone, the two did not meet until September 1982 when Mogar brought Brindisi to the office for a tour and evaluation. Gimello testified that Brindisi complimented him on the office's "stats," "overall numbers", and "revenue and collections." Brindisi told Gimello to "keep up the good work."
Mogar testified that after that discussion he and Brindisi went out to lunch to discuss business. The two men discussed which employees in the district were "promotable." Mogar told Brindisi that he felt Gimello was "promotable to a district manager's spot." Mogar testified that Brindisi said, "I don't feel Joe is promotable because of his size and weight." Mogar stated that Brindisi thought that Gimello would not be able to travel from office to office to perform a district manager's functions. Mogar stated that at first he laughed because he thought Brindisi was joking but he later realized that Brindisi was serious. When Mogar later told Gimello about the conversation, *346 Gimello was "surprised" but "handled it kind of lightly" because he felt his "track record would stand for itself."
As Gimello reflected on Brindisi's comment, he decided to try to lose weight. He consulted Dr. Samuel Goldman, a specialist of 30 years in the field of weight loss, who had successfully treated obesity in a person Gimello knew. On his first visit to Goldman on February 7, 1983 Gimello weighed 324 pounds. Dr. Goldman put Gimello on a diet and prescribed a diuretic and "[p]hendimetrozine and pheneramine," non-amphetamine appetite suppressants. Gimello lost 52 pounds and was down to 272 pounds in May 1983.
Goldman testified at the hearing both as a treating physician and as an expert in the field of treating obesity. He stated that a normal weight for a man of Gimello's height, age and frame was about 180 to 200 pounds. Goldman stated that while overeating, heredity and metabolism were factors that might cause obesity, pinpointing the exact cause of any patient's obesity is difficult. The doctor also related Gimello's statements about his life-long weight problem and family history of obesity. In Goldman's opinion, Gimello's weight did not impede his ability to perform his job. He said: "Mr. Gimello has been obese the majority of his life, and I doubt very much that it has been a detriment to his work in any way. It has no bearing on his ability to perform his duties."
At some point during Gimello's period of weight loss regime in early 1983, Mogar spoke to Brindisi and told the regional director about Gimello's dieting progress. Mogar testified that he told Brindisi that Gimello "dropped 30 or 40 pounds" and "two or three notches in his belt." Mogar said that Brindisi only responded by saying "he [has] to go a long way."
Gimello contends that Brindisi made other comments about Gimello's weight. In February or March 1983 a police officer came to the office to ask questions about unpaid parking tickets on the rental cars. Mogar called Brindisi to ask what to do. *347 Mogar explained that the officer threatened to take Gimello to the station unless they could pay the tickets. Mogar testified:
I mentioned to Rick [Brindisi] the cop is a pretty big boy and he will take Joe away. He came back with, well, he can't be bigger than Joe.
Gimello then picked up another telephone extension. He described the rest of the conversation:
So I got on the line, and Don [Mogar] stayed on the line as well, and Rick [Brindisi] said, is there a cop really bigger than you? And the cop was pretty gigantic, and I said, Yes, he is bigger than me, but he emphasized with overexaggeration, is he really bigger than you, about three times, and I just ignored the statements since he was a superior and proceeded with the facts at hand, what we were trying to accomplish.
Mogar also testified that during various telephone conversations, Brindisi would refer jokingly to Gimello's weight. Once, Mogar stated, Brindisi asked if Gimello was still eating his "nocal donuts." When Mogar once told Brindisi what Gimello ordered for lunch, Brindisi asked: "how can a guy eat two cheesesteaks and ... a diet coke? What's the sense of a diet coke?"
In April 1983 Brindisi and Vince Garrenton, a vice president of operations, visited the office on a "sneak attack" unannounced audit. Mogar said they "tore the office apart" and searched through files, drawers, desks, cars and his and Gimello's briefcases. Gimello stated that they "appeared to be looking for something." Later Brindisi and Garrenton talked with Mogar and Gimello and explained that there was a problem with employee turnover in the office. Gimello testified that this discussion was the first time anyone in upper management had referred to a turnover problem with the office. Gimello stated that neither Brindisi nor Garrenton offered any suggestions about how to deal with turnover in the office.
Mogar testified that when Gimello returned to the front of the office to assist customers, Garrenton told him that Gimello was the cause of the problem "because of his size and appearance." Garrenton pointed to Gimello through a window between the offices and said, "that's your problem over there, that fat slob." At the hearing Gimello produced a handwritten *348 note which he wrote following a conversation with Mogar. Gimello testified that the Division of Civil Rights had advised him to keep records of things his superiors said and did when he first consulted them in early 1983. The note is dated April 21, 1983 and says:
FROM DON [Mogar]
They fear I would hire fat sloppy people 4-21-83 8:05 a.m.
Gimello stated that he wrote the note after Mogar told him that Brindisi said that if Gimello were promoted he would hire fat, sloppy people. Though Mogar did not remember the comment, he did recall that around that time Brindisi told him that Gimello could not hire new employees without Mogar's approval. When Mogar talked to Brindisi the following day, Brindisi told Mogar to get Gimello to resign. Gimello would not resign. Brindisi put Gimello on "30 day probation" and told Mogar to fire Gimello if another new manager trainee quit or was fired. Mogar said that the office had recently hired a new manager trainee and was running an advertisement to recruit more applicants.
On May 23 and June 8, 1983 two manager trainees at the Cherry Hill office quit. When Gimello would not resign, Mogar fired him on June 9, 1983 at Brindisi's direction. The "employee change notice" form reflecting Gimello's termination shows that he was fired for: "Not providing the service to our customers, as ARAC offers ea [sic]; delivering washing rental units, due to turnover of manager trainees." Four days later, Agency fired Gimello's wife, Terrie, from her part-time job in the Cherry Hill office.
Vince Garrenton testified at the hearing. At the time that Gimello was the Cherry Hill office manager, Garrenton was Agency's vice-president of operations. Garrenton stated that he could recall "horror stories" about Gimello's Cherry Hill office "with respect to customer complaints and employee turnover." Garrenton testified that when he visited the office with Brindisi he witnessed Gimello's interaction with customers and employees. He described Gimello's manner as "crude" and *349 "very, very harsh." Brindisi had shown Garrenton a "computer sheet" listing employees who had been terminated from the Cherry Hill office. Garrenton stated that an office manager's "primary responsibility" is to recruit and train employees for advancement, and felt that the employee turnover in Gimello's office was unacceptable.
Agency also presented testimony from Terry Holt, a senior vice-president. Holt did not state that he had any personal experience working with Gimello. Holt testified that several men who worked for Agency were "heavier folks" about "240 and up." Gimello established on cross examination that none of these "heavier folks" were supervised by Brindisi. Holt said that the number of employees terminated while Gimello managed the Cherry Hill office was "extremely out of line" and unacceptable. Holt described the commendation awards as monthly motivational tools awarded on a "rotation basis." According to Holt, the regional directors distributed the "office of the month" plaques twice per month but the awards did not commemorate exceptional performance because regional directors could award the plaques for many reasons  especially if it was merely that office's turn to get one. Holt stated that Gimello's mistakes "wouldn't be tolerated" if Gimello worked for Agency currently.
When questioned about employee sales of DPC, Holt stated the DPC sales percentages could be "too high," suggestive of employees using "arm-twisting" sales techniques. He testified that average DPC sales of about 50% were "very acceptable." Percentages consistently over 70 to 75%, he said, indicated questionable sales techniques.
At the hearing Agency also presented several witnesses who had worked with Gimello. Robert Shinault started as a management trainee with Gimello in January 1980. Shinault described Gimello as "rough and callous" and that Gimello had called him "stupid" and "a f----ing a-hole" on a daily basis. Shinault said that Gimello treated all management trainees *350 poorly. Shinault testified that Gimello fired him in July 1980 after a particularly embarrassing argument in the office. The employee "change notice" reflecting Shinault's termination states that he quit after a reprimand about his poor attitude.
Andrew Drexler also testified for Agency. Gimello hired Drexler as a manager trainee in August 1980. Drexler testified that although a local employment agency referred him to the job, Gimello falsely told the agency that he did not hire Drexler in order to save the $900 fee. Drexler said that Gimello was "obnoxious" and "arrogant" towards customers and even made a remark stereotyping Jewish people when he learned that Drexler was Jewish. Gimello fired him in November 1980 for not following instructions and being "very slow on the road," though the change notice reflects that Mogar initiated Drexler's firing.
Lawrence Ston also testified for Agency. Ston had worked with Gimello at his new job at Insurance Rent-A-Car in 1984. Ston testified that Gimello was moody and once expressed a desire to "get back" at Agency for firing him. Ston also said that when Gimello later had fired him from Insurance Rent-A-Car, he (Ston) pushed Gimello and Gimello fell down. Ston stated that when he read about Gimello's suit against Agency in the newspapers he contacted Employer's main office in Ohio, apparently to offer his assistance.
When Gimello left the office he took several documents that Agency asserts belonged to it. The documents included termination forms for several manager trainees who had worked under Gimello and employment applications completed by applicants Gimello felt could have been hired but were rejected by Agency which also had copies of the documents. Agency alleged that Gimello took them to "falsely bolster his spurious allegations." Gimello explained that since the copies he retained were marked "Office Manager Copy" he was entitled to keep them.
*351 After he was fired on June 9, 1983, Gimello found another job about 1 1/2 years later, in October 1984. Gimello applied for and received unemployment compensation payments of $158 per week beginning July 1, 1983. The State Division of Unemployment sent Gimello a "notice of determination" which read:
You were terminated June 9, 1983 because management felt you were not promotable. There had been no complaints about your work. You worked to the best of your ability.
There is no evidence of willful misconduct in connection with your work. You are able and available for work.
Gimello testified that he actively sought another job but had difficulty because prospective employers thought that he must have done something wrong to get fired. Gimello described the first six months of his job search as "extremely aggressive" and "an eight-hour job, almost." Feeling some frustration, his search "tapered off" a bit, but he continued to look for employment for over three to four hours daily. Gimello testified that he kept records of his employment search as required by "the State."
Gimello and his wife testified extensively on the difficulties the family experienced after Agency fired him. Gimello stopped seeing Dr. Goldman because he could not afford to pay him. As a result, he claimed he regained the weight he lost. Both Gimello and his wife testified to the financial difficulties the family experienced following his termination. They incurred medical expenses which would have been covered by Gimello's insurance including expenses related to a "stress-related ulcer" which Terrie Gimello developed. Once they had depleted their savings, about $3,000, the family sold Terrie Gimello's car and an antique car, a 1948 Chrysler New Yorker which Gimello kept as a hobby. Gimello then borrowed about $3,500 from his brother and applied for food stamps in May 1984.
Terrie Gimello testified that she noticed a change in her husband's personality beginning in the fall of 1982. She stated that Gimello had become "withdrawn, more serious, less jovial *352 and very quiet" and Gimello told her about the comments he had received about his weight. She described his behavior as more private, less self-assured and less intimate. Gimello would not change his clothes with his wife in the room; the two rarely slept in the same bed.
Gimello's attitude improved when he found another job. In October 1984 Gimello began work as an office manager for Insurance Rent-A-Car in nearby Moorestown. Mogar had left Agency Rent-A-Car and went to Insurance Rent-A-Car as a manager in March 1984. He hired Gimello soon after Gimello contacted him.
From this sharply conflicting testimony, ALJ Duncan made strong credibility findings in favor of Gimello and against Agency. She was not very favorably impressed by Brindisi's failure to testify and by Agency's lack of apparent effort to secure his testimony by deposition. She found that "the Division had been adamant about Brindisi and Garrenton attending the fact-finding conference" but "those respondents had apparently chosen, for whatever reason, not to do so." At the time of the fact-finding conference on March 28, 1984, Brindisi was still employed by Agency. At the time of trial, Brindisi was employed in Solon, Ohio where Agency had its home office.
The ALJ found "with respect to the contested facts, I am far more persuaded by complainant's witnesses than respondents'." Agency's attempt "to explain away" anything which complimented Gimello on his performance was "unconvincing and reflected negatively on their credibility in general." She found that Gimello "was doing his job not merely adequately but exceptionally well." The ALJ said that "complainant impressed me as candid and sincere" and there was nothing to indicate his version "was anything but the truth." She found "the evidence reveals that turnover at the Cherry Hill office was fairly consistent over the years that complainant was the office manager." She found that over these years, 1979 to 1983, the office "was a very profitable one for the company; apparently *353 the turnover did not significantly affect office operations." She found no reliable evidence of any trainee or customer complaints or that Gimello was the reason for turnover, rather than low pay, long hours and other indigenous factors. The judge was not impressed with the few documents and forms that were taken by Gimello. She seemed to think this insignificant.
The ALJ found that the remarks attributed to Brindisi about Gimello's weight "were, in fact, made by him" and "that his concern with complainant's weight was the primary reason for his subsequent actions to effectuate the termination of complainant's employment." She also found Mogar's testimony in Gimello's favor "candid, sincere and credible" and found that he had recommended Gimello for promotion, a recommendation Brindisi and Garrenton rejected because of Gimello's size, i.e., he didn't feel complainant would be able to `get around' to the offices within the district." She also found that Garrenton did make the April 1983 remark attributed to him by Mogar  "that's your problem, that fat slob. Could you work for him? I couldn't."
The ALJ found no pervasive company-wide policy to discriminate against obese people but that was "not the issue in this case." She found Gimello "was the victim of subtle discrimination." She found Gimello and his wife "candid, sincere and credible witnesses" and the facts "to be as complainant's witnesses have recited them." She accepted Dr. Goldman's unopposed expert testimony. She summarized his testimony:
Dr. Goldman defined obesity as a compilation of fat in body tissue and stated that the known causes of obesity were overeating and heredity. He added that a person's metabolism plays a role in causing the condition. He described complainant as obese and used that term interchangeably with the term overweight. "There's no question ... in this case," he said. Dr. Goldman described the factors he considers in determining whether a person is obese or overweight; he indicated that there are several charts which prescribe normal ranges but stated that he makes a determination based upon his experiences, considering a person's height, frame, bone structure, appearance and age, and added that he considers blood pressure in determining what medication to *354 prescribe. It was Dr. Goldman's opinion that the normal range for complainant's age and frame was 180 to 200 pounds.
In response to a question from respondent's counsel, "Did you make any diagnosis of Mr. Gimello as to whether his particular overweight was due to overeating or was heredity?", Dr. Goldman responded, "That's hard to state. It can be heredity and it can be overeating. It can be both," and he concluded that any particular diagnosis in this area was "not possible."
As noted, Dr. Goldman found that Gimello's obesity "has no bearing on his ability to perform his duties."
The ALJ concluded that Gimello "suffered from a physical condition perceived by his employer as constituting a handicap and accordingly the provisions of the Law Against Discrimination apply to protect him." Since he was performing up to legitimate expectations the burden shifted to the employer to establish "some legitimate nondiscriminatory reason for the termination." She found that Agency's evidence was essentially unreliable hearsay, incredible, irrelevant or undocumented. She was not persuaded that Gimello caused any higher turnover than normal, if such a situation existed, which she doubted. She found the termination a "direct result of unlawful discrimination on the basis of obesity" and the reasons given "merely a pretext for discharging complainant."
Then-Director of the Division of Civil Rights Hawkins concurred in her findings of fact and conclusions of law in all respects on liability. He concluded that the defense was pretextual and without support. He found that "based upon the limited medical record in the present case, ... complainant has established that his obesity falls within the ambit of the LAD's definition of `handicapped'." He concluded that obesity may not be a handicap in "all cases" but the proof was sufficient in this case, whether considered an actual or perceived handicap.

II
Appellant Agency attacks the decision of the Director on several grounds. It contends: (1) the decision that Gimello is handicapped within the meaning of LAD is not based on sufficient credible evidence; (2) the LAD does not include perception *355 of handicap but even if it does, the evidence is insufficient to support the verdict; (3) the burden of proof was improperly shifted and appellant's defense should have prevailed; (4) the finding of agency is unsupported, and (5) damages were improperly calculated.
Agency does not seem to contend that obesity can never be considered a handicap subject of the the LAD. Indeed at oral argument Agency's able counsel said forthrightly that "we do not argue that obesity could not be a handicap, only that he did not establish that it was in this case." Counsel for Agency also contended that this is not a true "perception of handicap case."

III
We conclude that the record adequately supports the factual findings and the legal conclusion that Gimello was a victim of discrimination because of his obesity. We do not think it matters particularly whether his condition is dubbed an actual or perceived handicap. It was a recognized medical condition for which he sought legitimate treatment with but modest success. The record supports the conclusion that he was fired because of this physical condition which his supervisors perceived as a defect and which did not in fact disqualify him in any proven sense from his present job or his career path.
Our scope of review on the facts and reasonably drawn inferences from them is a limited one. We must survey the record and decide if there is sufficient credible, competent evidence in the record to support the Director's conclusions. Clowes v. Terminix Int'l Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988). We can only reverse if the decision is plainly unwarranted and manifestly mistaken. Id. at 588-589, 538 A.2d 794. We cannot so conclude on this record and we accept the findings in the Division.
Our Supreme Court has adopted the approach followed in Loeb v. Textron Inc., 600 F.2d 1003 (1st Cir.1979), as the model for a prima facie case of employment discrimination in *356 discharge cases. Clowes v. Terminix Int'l Inc., supra, 109 N.J. at 596-597, 538 A.2d 794. Those prima facie elements are:
1. That the employee was in the protected group;
2. that he was performing his job at a level that met his employer's legitimate expectations;
3. that he nevertheless was fired;
4. that the employer sought someone to perform the same work after he left. [Id. at 597, citing Loeb, 600 F.2d at 1014.]
ALJ Duncan applied these elements in her decision. The first element is really the issue on this appeal. While the parties differ over Gimello's job performance, the record supports the Division's finding that he met this one of the four prongs. The third and fourth elements are not in issue.
Though the Director found that Gimello adequately established his obesity as a "handicap" under the LAD, he approached the subject cautiously and stated:
I find it unnecessary to resolve every issue raised by Respondents concerning the ALJ's finding that obesity is a handicap within the Law Against Discrimination since that finding is not determinative of the outcome of this case. In addition to finding that obesity is a handicap under the LAD, the ALJ also found that "Complainant suffered from a physical condition perceived by his employer as constituting a handicap and accordingly the provisions of the Law Against Discrimination apply to him."
The Director found that Agency's perception of Gimello as handicapped by his obesity "establishe[d] an independent basis" for finding that Gimello was a member of the class protected by the LAD. The Director also found that Dr. Goldman's limited but unrefuted testimony sufficed to show that Gimello's obesity was a handicap within the "broad intendment" of the statute. He noted, however, that he found Goldman's "limited evidence insufficient [on which] to base a finding that in all cases obesity should be considered a handicap."
In finding Gimello's obesity to be a handicap covered by the LAD, the Director relied heavily on Clowes v. Terminix Int'l Inc., 109 N.J. 575, 538 A.2d 794 (1988). In Clowes, our Supreme Court recognized that alcoholism is a handicap within the meaning of LAD, though the plaintiff there failed to offer *357 sufficient evidence of his own alcoholism to prove that he had the handicap of alcoholism. Id. at 592-595, 538 A.2d 794. In his opinion, Justice Clifford noted that the complainant's unrefuted expert testimony established that "alcoholism is a disease with both mental and physical manifestations" and that the causes of the disease "have not been definitely identified." The court decided that the definition of "handicapped" in the LAD was sufficiently broad to include alcoholism as described by the unrefuted expert testimony. Id. at 593, 538 A.2d 794. The Director here similarly decided that obesity is within the broad remedial sweep of the LAD.
The issue of obesity as a handicap is novel in New Jersey. Our Law Against Discrimination generally provides:
It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. [N.J.S.A. 10:5-12].
The legislature first amended the LAD in 1972, L. 1972, c. 114, to include "handicap" as a prohibited basis for job-related decision-making and in 1978 amended the pertinent language to read:
All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment. [N.J.S.A. 10:5-4.1, L. 1978, c. 137, § 1].
Our statute defines "handicapped" as:
suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from *358 any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. [N.J.S.A. 10:5-5q].
Few courts, state or federal, have addressed the issue of obesity as a handicap. Those which have addressed the issue understandably have found it troubling.
In Philadelphia Elec. Co. [PECO] v. Pennsylvania Human Relations Comm'n, 68 Pa.Commw. 212, 448 A.2d 701 (1982), the Pennsylvania Commonwealth Court overruled the Human Relations Commission's [HRC] determination that the complainant was handicapped and that PECO illegally discriminated against her on the basis of her handicap. The Pennsylvania statute did not contain a definition of "handicap," though the HRC adopted regulations defining the term after the complainant filed her claim. The court used these definitions from Webster's Dictionary in making the decision:
handicap: ... a disadvantage that makes achievement unusually difficult; esp: a physical disability....
disability: ... a physical or mental illness, injury, or condition that incapacitates in any way. .. . [Id. 448 A.2d at 706.]
The opinion also cited "with approval" the Human Relations Commission regulation which defined a "handicapped or disabled person," in part, as someone who "has a physical or mental impairment which substantially limits one or more major life activities." Id. The New Jersey LAD has no such "major life activities handicap" requirement. In the PECO decision, Judge MacPhail found that though a morbidly obese person could be handicapped within the meaning of the statute, morbid obesity alone would not qualify as a handicap. He also found that the complainant was not a handicapped individual, noting specifically that she "had none of the diseases, none of the physical restrictions [and] none of the physiological characteristics" to which obese people are susceptible. Id. at 707. A recent decision of the Pennsylvania Supreme Court seems to agree with this position. Civil Serv. Comm'n v. Commonwealth *359 Pennsylvania Human Relations Comm'n, ___ Pa. ___, 591 A.2d 281 (1991).
In Greene v. Union Pac. R.R., 548 F. Supp. 3 (W.D.Wash. 1981), the judge decided that a complainant's obesity, "borderline hypertension," and osteoarthritis of the spine were not "handicaps" as defined in the Washington law prohibiting employment discrimination. The Washington statute did not actually define "handicap." The judge stated that the hypertension and osteoarthritis did not "interfere with plaintiff's normal day-to-day activities" and that obesity was not a handicap because obesity "was not an immutable condition such as blindness or lameness." Id. at 5. The judge also found that even if obesity was a handicap, the employer's height and weight requirements pertaining to the firefighter's job plaintiff sought were bona fide occupational qualifications permitted by the Washington law. Id.
However, in State Div. of Human Rights v. Xerox, 65 N.Y.2d 213, 480 N.E.2d 695, 491 N.Y.S.2d 106 (1985), the New York Court of Appeals upheld the trial court's finding that obesity was a handicap within that state's anti-discrimination statute. The New York statute provided that a disability may be a physical, mental or medical impairment which either prevents "the exercise of a normal bodily function" or is "demonstrable by medically accepted clinical or laboratory diagnostic techniques." 480 N.E.2d at 698, 491 N.Y.S.2d at 109. Judge Wachtler rejected the employer's contention that the law covered only "immutable disabilities"; he found that "the statute protects all persons with disabilities and not just those with hopeless conditions." Id. He also found that the complainant's obesity was a "medical condition" that was "clinically diagnosed" in accordance with the statutory definition. Id.
Several other cases considered the issue but left it unresolved. In Oregon State Correctional Inst. v. Bureau of Labor, 98 Or. App. 548, 780 P.2d 743 (1989), the judge remanded the case to the Commissioner of Labor to settle previously *360 undecided issues on the definition of "handicapped." Id. 780 P.2d at 747-48. In Krein v. Marian Manor Nursing Home, 415 N.W.2d 793 (N.D. 1987), the Supreme Court of North Dakota did not reject the contention that obesity may be a handicap, but required a complainant to make a showing of impaired abilities before she could proceed in a handicap discrimination suit. 415 N.W.2d at 796. The North Dakota statute did not define "physical or mental handicap" or "disability," so the Court turned to Webster's Dictionary to find "disability" defined as:
a physical or mental illness, injury or condition that hinders, impedes or incapacities
and "handicap" defined as:
a disadvantage that makes achievement unusually difficult esp. a physical disadvantage that limits the capacity to work. Id. at 795-796.
The claimant in Krein denied that her obesity disabled her at all and offered no expert testimony "equating [her obesity] to a disability or showing how it impaired her abilities." Id. The Missouri Court of Appeals in Missouri Comm'n on Human Rights v. Southwestern Bell Tel., 699 S.W.2d 75 (Mo. Ct. App. 1985), held that obesity alone is "probably not" a handicap under the Missouri law. Id. at 77. The Missouri statute defined "handicap" as
[a] physical or mental impairment resulting in a disability unrelated to a person's ability to perform the duties of a particular job or position for which he would otherwise be eligible and qualified for employment or promotion. Id.

The judge refused to find that the complainant's untreated hypertension, alone or coupled with her obesity, constituted a handicap, stating:
by ignoring the situation and taking no steps to treat and control her impairment [complainant] cannot get the benefit of the handicap law. Id. at 79.
Of recent note, in Salve Regina College v. Russell, 499 U.S. ___, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), the plaintiff recovered a verdict in federal District Court for breach of an implied agreement to educate her in the nursing program because she was asked to leave the college on account of her obesity. The federal Supreme Court ruling concerned the duty *361 of a federal Circuit Court to review the District Court judge's findings on applicable Rhode Island State contract law.
Both the ALJ and the Director remarked on the succinctness of Dr. Goldman's unopposed expert testimony here. Despite its brevity, based on his testimony we think that an obese person may be considered "handicapped" under our statute which states in pertinent part:
"Handicapped" means suffering ... from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which ... is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. [N.J.S.A. 10:5-5q.]
This is a very broad definition. Undisputedly, Gimello's obesity exists physiologically and is demonstrable by accepted diagnostic techniques.
The analytical tools used in Clowes v. Terminix Int'l Inc. 109 N.J. at 590-595, 538 A.2d 794, point almost inexorably towards an affirmance of the Division of Civil Rights. The Court started "from the perspective that because the LAD is remedial social legislation, it is deserving of a liberal construction." Id. at 590, 538 A.2d 794. The Court reminded us that "in Andersen v. Exxon, [89 N.J. 483, 446 A.2d 486 (1982)] we `adhered to a broad interpretation' of the Law with regard to the physically handicapped, rejecting the employer's contention that the Law is restricted in scope only to `severe' disabilities." Clowes v. Terminix Intern., Inc., 109 N.J. at 590, 538 A.2d at 796. The Court "also place[d] great weight on the interpretation given to the statute by the agency charged with its enforcement." Id. The Court recalled that the general purpose of the LAD is to fulfill those provisions of the State Constitution that guarantee civil rights and the specific purpose was to eliminate all forms of discrimination in employment based on a person's physical makeup. Id. at 591, 538 A.2d 794.
In Clowes, Justice Clifford reminds us that "the statutory definition of `handicapped' is very broad in scope" and "the Law does not [with few exceptions] define the specific conditions that fall within its sweep." Id. at 593, 538 A.2d 794. He points out that in Andersen v. Exxon, supra, and Panettieri v. C.V. *362 Hill Refrigeration, 159 N.J. Super. 472, 388 A.2d 630 (App.Div. 1978), the prevailing plaintiffs both suffered from handicaps not specifically defined in the LAD, i.e., spinal ailment and heart attack. He then concludes that since alcoholism is a disease that manifests itself both physically and psychologically, it falls within the LAD. We think obesity must also.
The Director also found that the ALJ's decision that Agency discriminated against Gimello due to a "perceived handicap" provided an "independent basis" for finding in favor of Gimello. Agency contends on appeal that the LAD does not prohibit discrimination on the basis of a perceived handicap. In the alternative Agency asserts that if perceived-handicap discrimination is covered by the LAD, the ALJ and Director based their decisions on insufficient evidence.
Both the ALJ and the Director relied on Rogers v. Campbell Foundry Co., 185 N.J. Super. 109, 447 A.2d 589 (App.Div.), certif. denied 91 N.J. 529, 453 A.2d 852 (1982), in deciding that the LAD addresses the perceived-handicap theory of coverage. In Rogers Judge Antell found that an employer discriminated against a complainant who had a "prominent hilar shadow on his left side." 185 N.J. Super. at 111, 447 A.2d 589. The Director had found that Rogers' condition was normal and non-disabling and that the employer nevertheless denied employment to the complainant as a matter of "company policy." Id. Judge Antell held that even though the complainant was not actually "handicapped" within the LAD's definitions, the LAD's prohibition against discrimination applied to cases where the complainant's condition is non-disabling. Id. at 112-113, 447 A.2d 589. Judge Antell noted the Supreme Court's apparent approval of the perceived-handicap theory of discrimination in Andersen v. Exxon Co., 89 N.J. 483, 495 n. 2, 446 A.2d 486 (1982), in part as the basis for the decision in Rogers. 185 N.J. Super. at 112-113, 447 A.2d 589.
In Andersen, our Supreme Court found that the complainant offered sufficient evidence to demonstrate his spinal and lumbar *363 disc "ailments" to support a finding that he was "handicapped" within the LAD. 89 N.J. at 494, 446 A.2d 486. The Court, while distinguishing Andersen from a perceived handicap case, noted the "implications" of the perceived-handicap theory that were present "where the employer has determined that the complainant's condition was serious enough to deny him employment." Id. at 495 n. 2, 446 A.2d 486. See also Poff v. Caro, 228 N.J. Super. 370, 549 A.2d 900 (Law Div. 1987), where the Director obtained a preliminary injunction in a case involving discrimination by a landlord against three homosexual men whom he refused to lease to because he feared they might contact AIDS. The prospective tenants did not in fact have AIDS and were not "handicapped" under the LAD. Id. at 377, 549 A.2d 900. Nevertheless, Judge Humphreys issued the injunction, stating that "[d]istinguishing between actual and perceived handicaps makes no sense." Id. He noted that the LAD could not be "reasonably read" to allow a landlord to discriminate against someone whom he erroneously thought was a member of a religious or racial minority, since that interpretation would only protect against discrimination in cases where the wrongdoer accurately perceived the discriminatee's "classification." Id. at 377-378, 549 A.2d 900.
In June 1985 the DCR adopted rules specifying that the LAD includes a prohibition of discrimination on the basis of a perceived handicap. N.J.A.C. 13:13-1.3(1) provides that:
"Handicap" as used in this chapter will have the same meaning as that term is given by N.J.S.A. 10:5-5(q). It is also unlawful to take any action prohibited by these regulations:
1. Because of a perception or belief that an individual suffers from a handicap, whether or not that individual is actually handicapped....
Agency contends that this regulation is an attempt by the DCR to legislate without authority through regulations. DCR calls the regulation "merely a codification of the Division's long-standing interpretation" and of the Rogers decision.
Our search discloses that courts in other jurisdictions have interpreted their states' anti-discrimination laws consistent with *364 the perceived handicap principle. In Barnes v. Washington Natural Gas Co., 22 Wash. App. 576, 591 P.2d 461 (Wash. Ct. App. 1979), the court reversed the trial judge's decision dismissing the plaintiff's handicap discrimination claim. The trial judge had found that the plaintiff could not pursue the claim because he was not "handicapped." 591 P.2d at 462-63. The Washington statute did not specifically prohibit discrimination on the basis of a perceived handicap. Id., 591 P.2d at 463. The plaintiff had been fired because his employer erroneously believed that he had epilepsy. Id., 591 P.2d at 462. The Washington intermediate court allowed plaintiff to proceed with his claim, holding that the "class protected by the statute is those persons whom the employer discharges or intends to discharge because he believes the person is afflicted with a `mental, sensory, or physical handicap.'" Id., 591 P.2d at 465.
In Dairy Equip. Co. v. Department of Indus., 95 Wis.2d 319, 290 N.W.2d 330 (1980), the Wisconsin Supreme Court decided that an employer which fired an employee because the employee had only one kidney had illegally discriminated. The Wisconsin statute did not contain a definition of the word "handicapped" and the lower court turned to Webster's dictionary to find "handicapped" defined as
... a disadvantage that makes achievement unusually difficult; esp. a physical disability that limits the capacity to work. [290 N.W.2d at 335.]
Since the complainant in Dairy Equip. was fully functional, he had no "disadvantage that ma[de] achievement unusually difficult" and was not "handicapped" within the dictionary definition. Id. The Wisconsin Supreme Court agreed with the trial judge, holding that the employer illegally perceived the complainant as handicapped. Though the language of the statute did not specifically cover perceived handicaps, the court stated:
It would be both ironic and insidious if the legislative intent in providing the protection of the Fair Employment Act were afforded to persons who actually have a handicap that makes "achievement unusually difficult" or limits their capacity to work, but the same protection is denied to those whom employers perceive as being handicapped. [Id. at 335].
*365 In any event, we do not think the "perceived handicap" issue is critical to our decision here. The fact is that Gimello was obese, as demonstrated by unrefuted medical evidence. The employer's actual perception may not be particularly important when a real medical or pathological condition exists. The important point is that the record supports the Director's finding that the employer terminated Gimello because of a condition covered by the broad language of N.J.S.A. 10:5-5q which condition did not prevent him from doing his job. This is employment discrimination under the LAD and is actionable. This type of prejudice "is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be unrelated to job performance or to be non-existent." Barnes v. Washington, 22 Wash. App. 576, 591 P.2d 461, 465 (Wash. Ct. App. 1979), cited with approval, Andersen v. Exxon Co., 89 N.J. at 495 n. 2, 446 A.2d 486. See Jansen v. Food Circus Supermarkets Inc., 110 N.J. 363, 541 A.2d 682 (1988), where Justice Pollack says: "The essence of discrimination ... is the formulation of opinions about others not on their individual merits, but on their membership in a class with assumed characteristics." 110 N.J. at 378, 541 A.2d 682. We affirm the Director's decision finding unlawful employment discrimination Gimello because of his obesity.

IV
We reject appellant Agency's contentions that the complainant's ultimate burden of proof was not met or was improperly shifted, that the defense of justifiable termination should have prevailed as a matter of law, and that principles of agency law should not impute liability here. They are clearly without merit and require no discussion. R. 2:11-3(e)(1)(D) and (E). We conclude from the record that complainant shouldered and fully carried his burden of proof. Obviously, the ALJ found Agency's proofs completely unreliable.

*366 V
We turn to the issues of damages. Under N.J.S.A. 10:5-17 the Director ordered Agency[1] to pay Gimello the following as damages:
1. back pay from June 10, 1983 to the date of the Director's decision [April 17, 1989]; less Gimello's interim earnings and value of a car he used while at Insurance Rent-A-Car; plus prejudgment interest on the award pursuant to R. 4:42-11.
2. $2,876.31 as "incidental compensatory damages";
3. $10,000 for "pain, humiliation and suffering;
4. attorneys' fees pursuant to N.J.S.A. 10:5-27.1.
Employer claims that (1) back pay should stop accruing when Gimello found "comparable employment," (2) the Director improperly valued the car Gimello used at Insurance Rent-A-Car, and (3) 1983 backpay figure was erroneous.

A. BACK PAY FOR 1983.
The parties agree that the Director used the wrong figure for Gimello's 1983 income. The Director used $10,659.58 but Gimello earned $12,058.63. Accordingly, the back pay award should be reduced by $1,399.05 and interest should be recomputed.

B. BACK PAY ACCRUAL AFTER GIMELLO BECAME EMPLOYED WITH INSURANCE RENT-A-CAR.
Employer contends that once Gimello became employed by Insurance Rent-A-Car on October 3, 1984 the back-pay award should stop accruing. We disagree. Employer's reliance upon Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 429 A.2d 341 (1981), in support of this assertion is misplaced. Goodman states that back-pay accrual ceases when the complainant becomes "employed in an equivalently paying position." Id. at 42, 429 A.2d 341. Though Gimello's job at *367 Insurance Rent-A-Car was certainly "comparable employment" appropriate to mitigate Gimello's damages, see Goodman, 86 N.J. at 36, 429 A.2d 341, it did not provide "equivalent pay" as Goodman mandates. Ordinarily back pay accrues from the date of discharge to the date of the decision and is reduced by interim earnings. Goodman, 86 N.J. at 34, 429 A.2d 341, see also Herrin v. Newton Cent. Appraisal Dist., 687 F. Supp. 1072, 1078 (E.D.Tex. 1987), new trial denied 706 F. Supp. 511 (E.D.Tex. 1988); Ackerman v. Western Elec. Co., 643 F. Supp. 836, 855 (N.D.Cal. 1986), aff'd, 860 F.2d 1514 (9th Cir.1988). "The basic purpose of awarding back pay is to make the discriminatee whole by reimbursement of the economic loss suffered, though it should correlatively discourage and deter unlawful discrimination." Goodman, 86 N.J. 34-35, 429 A.2d 341.
Insurance Rent-A-Car paid Gimello a starting base salary of $14,000 annually, which increased in $1,000 increments to $25,000 by November 1987, when the hearing started. Until 1987 Insurance Rent-A-Car did not have a program for bonuses but did provide a company car for Gimello to use, a benefit he did not enjoy at Agency.
At least until 1987, Gimello did not earn pay equivalent to what he would have been paid had Agency not fired him. In 1987 Gimello's earnings exceeded the comparable salary he might have made if he were working for Agency. Agency contends that Gimello's achievement of equivalent pay terminates its obligation for back pay, even though in 1988 Gimello earned somewhat less than the amount paid by Agency. We agree that the award of back-pay terminates as of 1987 when the earnings became equivalent.

C. THE DIRECTOR'S CALCULATION OF BACK PAY.
In calculating the back pay the Director compared Gimello's interim earnings to the sum earned by Agency's highest-paid office manager. Agency asserts that rather than using *368 the highest-paid manager's salary for comparison, the Director should have used Gimello's successor's salary to determine the correct amount of back pay. Here is a comparison between Agency's highest-paid manager's salary and Gimello's successor's salary for the years in implicated:

 Highest Gimello's
 paid manager successor
 1983 $24,100.00 $21,806.89
 1984 $24,778.96 $23,644.16
 1985 $24,130.10 $20,885.80
 1986 $26,478.55 $27,313.47
 1987 $26,760.97 $23,431.01

Gimello asserts that the Director used the correct salary for comparison because his successor's earnings were not a proper reflection of what a more experienced manager might earn. We affirm the Director's method. N.J.S.A. 10:5-17 provides the Director with substantial discretion to order appropriate remedies upon finding a party liable. Talman v. Board of Trustees, 169 N.J. Super. 535, 541-542, 405 A.2d 423 (App.Div.) certif. denied, 81 N.J. 407, 408 A.2d 801 (1979); see Jackson v. Concord Co., 54 N.J. 113, 126-128, 253 A.2d 793 (1969). The salaries of Agency's highest-paid manager and of Gimello's successor were not so disparate that choosing either for purposes of comparison constitutes an abuse of discretion.

D. THE VALUE OF THE CAR IN COMPUTING GIMELLO'S INTERIM EARNINGS.
Insurance Rent-A-Car provided Gimello with a company car each year during his employment. The ALJ accepted Agency's method of placing a value on the car in order to calculate Gimello's mitigation of damages. Agency asserted that the method advanced by its treasurer, Edward Hammer, was the appropriate method to place a value on the car. Hammer described a lengthy calculation on the value of the car and concluded that the result of his calculation represented the amount "Gimello would have had to earn to buy that asset."
*369 The Director rejected the ALJ's decision to rely on Hammer's calculations. The Director instead employed the IRS's methodology to determine the value of the car to Gimello. He stated:
I find it inappropriate to attribute a value to an employee benefit far beyond that which the Federal Government attributes to that same employee for that same benefit. I know of no legal precedent for such a formulation and find that the methodology urged by Respondents will only serve to burden future litigation on such issues with the necessity of expert testimony when the IRS has already developed an acceptable alternative valuation of the same benefit.
The computation ordered by the Director reflects the amount that the IRS would consider taxable income to Gimello. We affirm the Director's decision. We fail to see why the value of the car for IRS purposes is not a suitable figure for determining mitigation of damages.

E. THE DELAY IN THE DECISION AND THE EFFECT ON DAMAGES.
Agency asserts that it should not be "penalized" for the DCR's delay in arriving at a final decision. Gimello filed his complaint in July 1983. The Director filed his decision on liability in April 1989. The Director filed the final order specifying damages in April 1990. Agency cites EEOC v. Peterson Howell and Heather Inc., 702 F. Supp. 1213 (D.Md. 1989), in support of its argument. In Peterson, the District Court held that the EEOC could not recover damages on behalf of a class of Title VII discrimination victims because the EEOC had inexplicably delayed filing suit. Though a charge was filed with the EEOC in September 1980, the EEOC did not file a lawsuit until five years and two months later in November 1985. The employer received the complaint in January 1986. The judge held that the doctrine of laches will bar a plaintiff's recovery when the defendant employer is able to demonstrate prejudice from "unreasonable or unexplained delay in bringing proceedings." Id. at 1220.
Unlike the situation in Peterson, however, Gimello filed his claim almost immediately after he was fired. Five years and nine months elapsed between Gimello's filing a claim with the *370 DCR and the Director's decision on liability. Though this passage of time is similar to that in Peterson, Agency has not demonstrated that there was any "delay in bringing proceedings" by Gimello or how it was unfairly prejudiced by the unfortunately lengthy duration of the proceedings.
We affirm the Director's decision on liability but modify the damage award, as indicated. We remand without retention of jurisdiction for calculation and modification of the damage award consistent with our ruling within 30 days.
NOTES
[1] The claims against Brindisi and Garrenton as individuals were dismissed by the ALJ. There is no cross-appeal pressed from the dismissals as to these individuals.